[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13752

_____

JERRY SCOTT HEIDLER,

Petitioner-Appellant,

*versus*

WARDEN, GDCP

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 6:11-cv-00109-LGW

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

L∪ᴄᴋ, Circuit Judge:

In the early morning of December 4, 1997, Jerry Heidler broke into the home of Danny and Kim Daniels and shot them and two of their children to death. Heidler was convicted and sentenced to death for the murders. He now appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. section 2254.

Heidler makes three arguments on appeal. First, Heidler contends that the Georgia Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in denying his claim that his trial counsel were ineffective in investigating and presenting evidence of his mental health during the guilt phase of his trial. Second, he argues that the Georgia Supreme Court unreasonably applied *Strickland* in denying his claim that his trial counsel were ineffective in investigating and presenting mitigating evidence during the penalty phase of his trial. And third, Heidler argues that the district court erred in concluding that he did not sufficiently plead, and did not exhaust, his claim that his trial counsel were ineffective because they failed to adequately present information and evidence in pretrial motions relating to Heidler waiving his constitutional rights while he was being interrogated by the police. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Murders

Danny and Kim Daniels lived in Santa Claus, Georgia—a small town in Toombs County—with their seven children, three of

whom were foster children.  Mrs. Daniels had been in foster care herself as a child.  And over the years, the Danielses opened their home to many foster children—including Heidler's sister Joanne. While his sister was staying there, Heidler would visit the Danielses' home.  Even after his sister left their care, Heidler continued to visit their home.  But Mr. Daniels asked Heidler to stop visiting after the twenty-year-old Heidler developed a relationship with the Danielses' sixteen-year-old daughter.

Around the time that Mr. Daniels told Heidler to stop visiting the home, Heidler's girlfriend, Marie Spivey, "got pregnant . . . with [Heidler and Ms. Spivey's] second son."  Six months into Ms. Spivey's pregnancy, though, the baby boy was stillborn.  Days later, on December 3, 1997, Heidler went to his stillborn son's funeral. Distraught, Heidler left the funeral and drove to the Danielses' home.  Heidler explained that his "mind just went blank" and that he "[j]ust couldn't take nothing."  All he felt was "rage."

When he got to the Danielses' home, Heidler entered the house through a back window, smoked a cigarette, and took a shotgun from Mr. Daniels's gun cabinet.  He then went to the master bedroom and shot Mr. and Mrs. Daniels as they slept.  Mrs. Daniels probably died instantly, but Mr. Daniels survived the initial shot. At the time, Mr. Daniels was forty-seven years old.  Mrs. Daniels was thirty-three.

After shooting Mr. and Mrs. Daniels, Heidler left their room and went to the Danielses' eight-year-old son's bedroom.  When he got there, Heidler killed the sleeping boy with a shot to the head

from close range.  The Danielses' sixteen-year-old daughter woke up from the commotion and ran to her parents' bedroom, where Heidler shot her in the back of the head, killing her instantly. When Heidler noticed that Mr. Daniels was still alive, Mr. Daniels threw up his hands and arms to protect himself but Heidler shot him a second time.  Then a third time.  Then a fourth.  Those shots were fatal.

After killing Mr. and Mrs. Daniels and two of their children, Heidler left the Danielses' two youngest children—a four-year-old boy and a ten-month-old infant—in the house with their dead family members.  But Heidler took the Danielses' three young daughters with him to a secluded place where he sexually assaulted one of them, who was eight years old.  Heidler threw Mr. Daniels's shotgun into a river, dropped the girls off on the side of a dirt road, and returned to his stillborn son's grave.  After that, Heidler went to his mother's house to sleep and play video games.

### B.    *Heidler's Arrest and Confession*

Later that morning, police found the Danielses' three young daughters in the middle of the road in their pajamas.  The girls identified Heidler as their kidnapper.  Police arrested Heidler, informed him of his *Miranda*[1] rights, and interrogated him for about four hours.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

During the interrogation, Heidler said that he remembered what had happened in the Danielses' home "as if it were in a dream." The interrogating police officers asked Heidler if they could "come with [him] and walk in this dream with [him]" and Heidler then told them "what he remembered from his dream." At the end of the interrogation, the officers videotaped Heidler's confession in which he admitted to killing Mr. and Mrs. Daniels and two of their children, and to "t[aking] the girls" and "molest[ing]" one of them.

C.    *Trial Counsel's Investigation of Mitigation Evidence*

Two experienced criminal defense attorneys were appointed to represent Heidler at trial. The first, Michael Garrett, served as lead counsel. Before Heidler's case, Mr. Garrett had defended about fifty death penalty cases, including approximately forty that he tried first chair. Mr. Garrett had experience presenting a mental health defense in "many" capital cases. "Of the nearly fifty clients that Mr. Garrett ha[d] represented in death penalty cases[,] only two received the death penalty."

The second attorney was Kathy Palmer. Ms. Palmer was the contract public defender in Toombs County. Before Heidler's case, Ms. Palmer had tried "several" murder cases and first chaired three of them. She had also tried a death penalty case involving mental health issues before taking Heidler's case and was "very familiar with the process of a death penalty case" and "everything that needed to be done in order to prepare for a death penalty case."

Based on their initial meetings with Heidler, Mr. Garrett and Ms. Palmer were "totally convinced" that Heidler was mentally ill. Mr. Garrett and Ms. Palmer also determined that "the facts were overwhelming as to what happened" on the night of the murders. So Mr. Garrett and Ms. Palmer decided to pursue a "guilty but mentally ill" verdict to avoid a death sentence.[2] Mr. Garrett took responsibility for "deal[ing] with the mental health issues." Ms. Palmer took responsibility for "mitigation," which involved "investigating [Heidler's] background and finding out anything that [she] could in regards to reasons as to why [Heidler] was mentally ill and

---

[2] At the time of Heidler's trial, Georgia law provided:

> In all cases in which the defense of insanity is interposed, the jury, or the court if tried by it, shall find whether the defendant is:
>
> (A) Guilty;
>
> (B) Not guilty;
>
> (C) Not guilty by reason of insanity at the time of the crime;
>
> (D) Guilty but mentally ill at the time of the crime, but the finding of mentally ill shall be made only in felony cases; or
>
> (E) Guilty but mentally retarded, but the finding of mental retardation shall be made only in felony cases.

Ga. Code Ann. § 17-7-131(b)(1) (1998). A "guilty but mentally ill" verdict didn't preclude a death sentence. *See id.* § 17-7-131(g), (j); *Spivey v. Head*, 207 F.3d 1263, 1280 (11th Cir. 2000) ("[B]oth guilty but mentally ill and guilty but mentally retarded defendants are sentenced the same as those found guilty of the offense except that those found guilty but mentally retarded are not eligible for the death penalty.").

what about his past would help to convince a jury that he should not receive the death penalty."

<u>Trial counsel hired an investigator to assist in their investigation, interviewed witnesses, and gathered Heidler's records</u>

During Mr. Garrett's and Ms. Palmer's initial meetings with Heidler, Heidler "was totally nonresponsive." In later meetings, Heidler continued to provide only "minimal" information to Ms. Palmer. Beyond interviewing Heidler, Ms. Palmer also hired an investigator, Frank Gillis, to help her "find witnesses down in the country." Investigator Gillis sought out Heidler's "aunts and uncles and cousins" and some of Heidler's friends. Ms. Palmer also "drove up and down the dirt roads" and "went up and down the street where [Heidler] lived" going "door to door and around the community and at the convenience store" to investigate Heidler's background. Ms. Palmer also went "to the jails," to the "Juvenile Court," and to the Toombs County Department of Family and Children Services ("DFACS") to speak with caseworkers and gather Heidler's records. And when Investigator Gillis found "anything helpful," Ms. Palmer would "follow up [her]self" to interview the witnesses that Investigator Gillis found.

Ms. Palmer interviewed Heidler's mother, his aunt and uncle, and his sister, Lisa Aguilar. Ms. Palmer described Heidler's family members as people who "run from you, they don't come and pour out information at all." According to Ms. Palmer, Ms. Aguilar was the "most sympathetic family member," while Heidler's mother was "an absolute, raving lunatic." Heidler's

mother claimed that Heidler "was not guilty," that "this was a con-spiracy," and that Heidler's brother Steve (who was in prison) "committed the murders." She was "not helpful" at all. Ms. Palmer and Investigator Gillis also interviewed Heidler's friends, but they "weren't sympathetic" or "helpful."

Ms. Palmer also met with a DFACS attorney and casework-ers to "put[] together the history of how [Heidler's] mother had mistreated him and his stepfather had abused him and how they had run from DFACS and [Heidler had] been in and out of care." Ms. Palmer explained that it was "very hard" to piece together Heidler's history because his mother "had jumped county to county." Ms. Palmer "spent hours" going through Heidler's DFACS records with the DFACS attorney and caseworkers.

Ms. Palmer used the information from Heidler's DFACS rec-ords to find his former foster parents and people who had inter-acted with him while he was under DFACS's care. But "a lot" of them "didn't want to talk" to Ms. Palmer because "the murder[s] [were] so bad." Heidler's case "was exceedingly traumatic for the people of Toombs County and [DFACS] because of children in their care being involved and the fact that many of them knew [Heidler]." For example, one of the juvenile probation officers that Ms. Palmer interviewed was at first "very sympathetic" and "help-ful" over the phone but then claimed not to "remember anything about anything" when Ms. Palmer tried to interview him in person. And when Ms. Palmer visited the Cedarwood Psychoeducation Program, a school for emotionally and behaviorally "disordered"

students that Heidler attended during his middle school years, Ms. Palmer could find only one teacher, Marilyn Dryden, who would testify at Heider's trial.

<u>Trial counsel retained two mental health experts to evaluate Heidler</u>

Mr. Garrett retained a psychologist, Dr. James Maish, to evaluate Heidler. Dr. Maish met with Heidler six times, interviewed him "extensively," and gave him a "battery of tests." Mr. Garrett and Ms. Palmer provided Dr. Maish with reports of Heidler's behavior in jail and "several binders" of Heidler's background records, including records "from mental health centers in Southeast Georgia," "DF[A]CS records," and "reports from juvenile settings."

Based on his evaluation of Heidler and his review of Heidler's records, Dr. Maish diagnosed Heidler with "borderline personality disorder." Dr. Maish concluded that Heidler "did not meet the standard for not guilty by reason of insanity for the state of Georgia" and that Heidler was competent to stand trial because he "ha[d] a rational as well as reasonable understanding" of his criminal proceedings. But Dr. Maish thought that Heidler "met the standard" for a "guilty but mentally ill" verdict because of his borderline personality disorder diagnosis.

Mr. Garrett also retained Dr. Albert Olson, a "neurological expert," to evaluate Heidler for "pathological issues," "brain damage," or a "head injury" and to do "neurological testing." Dr.

Olson's evaluation "didn't find anything that [trial counsel] thought would be helpful" to Heidler's case.

<u>Trial counsel interviewed the court-appointed mental health experts</u>

Because Heidler pleaded not guilty and his trial counsel gave notice of his intent to raise a mental illness defense, Georgia law required the state trial court to order Heidler to undergo a separate, independent psychological evaluation. *See* Ga. Code Ann. § 17-7-130.1; *Nance v. State*, 526 S.E.2d 560, 564 (Ga. 2000). In line with this requirement, the state trial court appointed three mental health experts to evaluate Heidler: Drs. Nic D'Alesandro, Gordon Ifill, and Everette Kuglar.

Mr. Garrett provided Heidler's background records and "anything that [Ms. Palmer] got" from her background investigation to Drs. D'Alesandro, Ifill, and Kuglar and interviewed each of them before trial. Based on his interviews, Mr. Garrett understood that Drs. D'Alesandro, Ifill, and Kuglar "seemed to agree [with Dr. Maish] that [Heidler] was mentally ill." Mr. Garrett thought that Dr. Maish's testimony "was going to be the strongest" but was "confident" that Drs. Ifill and Kuglar would accurately present Heidler's mental health at trial.

D.    *Trial Counsel's Motion to Suppress Heidler's Statement to Police*

Before trial, trial counsel moved to suppress "all evidence obtained in the course of any illegal search and seizure" and explained in their motion that because "discovery and defense investigation [were] still ongoing and incomplete," they "file[d] this

preliminary motion to suppress in general form so as to preserve the right to challenge the legality of any search or seizure of evidence that the [s]tate might introduce at trial."

The state trial court held a *Jackson-Denno*[3] hearing on the admissibility of Heidler's statement to police. During the hearing, the state called the two police officers who had interrogated Heidler after his arrest. Mr. Garrett cross examined the officers about Heidler's statement that he "could remember things if he was in his dream" and how the police officers "g[ot] in his dream with him and . . . participated as best [they] could."

The state trial court denied the motion to suppress Heidler's statement to police. The state trial court "f[ound] from a preponderance of the evidence that [Heidler] was advised of each of his *Miranda* rights, that he understood them, that he voluntarily waived them, and that he thereafter gave his statement knowingly, freely[,] and voluntarily without any hope of benefit or fear of injury."

### E.    The Trial

Then came the trial—which was split into a guilt phase and a sentencing phase. We'll start with the guilt phase. During the guilt phase, the state introduced video and photographs of the

---

[3] *See Jackson v. Denno*, 378 U.S. 368 (1964). In *Jackson*, "the Supreme Court held that, when a defendant objects to the introduction of his statement as involuntary, due process requires a trial judge to make an independent determination that the statement is voluntary before permitting it to be heard by the jury." *Miller v. Dugger*, 838 F.2d 1530, 1535 (11th Cir. 1988).

murder scene, evidence that Heidler's fingerprint was on the back window of the Danielses' home, evidence that Heidler's DNA was on a cigarette butt found at the Danielses' home, evidence that the Danielses' three daughters identified Heidler as their kidnapper, and evidence that Heidler sexually assaulted one of the them The state also played Heidler's videotaped confession and called the two police officers who had interrogated him to testify about his statements during the interrogation.

After the state rested, the state trial court ruled—over the state's objection—that it would call Drs. D'Alesandro, Ifill, and Kuglar as witnesses and would permit Heidler to use the court-appointed experts to prove his mental health condition. Based on the state trial court's ruling, Mr. Garrett decided not to call Dr. Maish during the guilt phase because he "wanted to let the jury hear the mental health evidence on the front end with [Drs. D'Alesandro, Ifill, and Kuglar], and then let them hear it all over again [in the penalty phase] from someone who [Mr. Garrett] thought would . . . give the strongest testimony." Thus, trial counsel rested their case without calling any witnesses during the guilt phase but presented mental health evidence through Drs. D'Alesandro's, Ifill's, and Kuglar's testimony. We'll walk through that testimony now.

<u>Trial counsel's guilt phase presentation of mitigation evidence</u>

*Dr. D'Alesandro*

Dr. D'Alesandro was employed by Georgia as a "coordinator of forensic services" and "forensic psychologist" at the Georgia Regional Hospital in Savannah. Dr. D'Alesandro testified that he,

together with Dr. Ifill, performed "a fairly extensive evaluation" of Heidler that included two "clinical interview[s]" and "a review of the voluminous records that were provided . . . by both the [state] as well as [trial counsel]." The records that Dr. D'Alesandro reviewed included records from Satilla Mental Health (a mental health institution where Heidler had been treated), "mental health histories," "school records," "prior mental health evaluations," and "clinical documents." Those records also included "police reports," "witness statements," and "investigating officers' reports." Dr. D'Alesandro also "talked to the jail employees that were . . . watching [Heidler] during the time of his incarceration."

Dr. D'Alesandro explained that the state trial court had posed two questions for him to answer when it appointed him to evaluate Heidler: "[o]ne, is the defendant competent to stand trial"; and two, "was [Heidler] affected by some form of mental illness such that it would make him incompetent or make him not responsible for his behaviors." As to Heidler's competency to stand trial, Dr. D'Alesandro concluded, based on his evaluation, that Heidler was not mentally disabled and was competent to stand trial because Heidler "understood the proceedings" and "was able to work with his attorney in the preparation of his defense."

As to whether Heidler was not guilty by reason of insanity, Dr. D'Alesandro concluded, "based on the information [that he and Dr. Ifill] had and on the [Georgia] statutes," that Heidler "was responsible for his behaviors during that time frame [of the murders]." Dr. D'Alesandro said that "there had been no indication

that [Heidler] was psychotic" when he killed the Danielses, which would have meant "that [Heidler] was out of contact with reality or that he was unaware of what he was doing." Instead, Dr. D'Alesandro testified that "what [Heidler] was doing was volitional and it was fairly goal directed." For this reason, Dr. D'Alesandro concluded that Heidler "kn[ew] the difference between right and wrong, and . . . d[id] not meet the criteria for not guilty by reason of insanity."

Dr. D'Alesandro diagnosed Heidler with alcohol and substance abuse and "a number of personality disorders which have influenced his behaviors, have affected the way he perceive[d] things, [and] the way he [thought] about things." Dr. D'Alesandro "found severe emotional problems beginning in [Heidler's] childhood" that Heidler "was still suffering from" at the time of his evaluation.

Dr. D'Alesandro explained that Heidler "probably would best be identified as a borderline and/or an antisocial personality disorder," which meant that, "through his upbringing, . . . he'[d] developed behavioral patterns which [were] basically in conflict with society." Dr. D'Alesandro testified that a person with borderline personality disorder would be "really unstable," have "a very poor sense of themselves," "overreact to stimuli," and "at times become very dramatic" and "impulsive." Dr. D'Alesandro stated that a person with antisocial personality disorder "doesn't really care about the rights of others," "do[es] things that are in conflict with society," and "know[s] what they're doing, but at the same time

they're willing to go ahead and suffer the consequences." Dr. D'Alesandro agreed that this "severe disorder" would "influence [Heidler's] decision-making capacity."

Dr. D'Alesandro said that, "[f]rom the information [he] got, [Heidler] did experience hallucinations . . . during a time that he was doing some type of drug." Dr. D'Alesandro also testified that, in examining Heidler's mental history, "[t]here was a suggestion" that Heidler had experienced "psychotic episodes." Although he "did not find sufficient evidence to validate that [Heidler] actually was psychotic," Dr. D'Alesandro explained that "people with this type of diagnosis sometimes will get to such an extreme that they may temporarily at least function in a psychotic-like state, but it's usually very transient," meaning that it "[c]omes and goes very quickly" in a matter of "[m]inutes."

Dr. D'Alesandro testified that Heidler's mental health problems "seemed to be pretty much right from childhood, early childhood." Dr. D'Alesandro described Heidler's childhood as "chaotic" and "dysfunctional" and said that Heidler was "[d]eprived of the familial love and support that one normally would expect to get as he's being brought up." Dr. D'Alesandro explained that Heidler's mental health issues resulted from "the chaos of someone being brought up in that type of environment." And Dr. D'Alesandro agreed that Heidler "ha[d] been subjected to serious traumatic experiences in his childhood at a very early age."

Dr. D'Alesandro gave the jury a few examples of Heidler's traumatic childhood experiences. Dr. D'Alesandro testified, for

example, that "there was some indication of voodoo and cultism brought in that was practiced in [Heidler's] family." He explained that, "as a child, [Heidler] evidently was placed in a number of foster homes throughout his developmental years, and as a result this in effect caused some type of lasting effect on him in terms of where he had problems or he felt abandoned by his family." Dr. D'Alesandro told the jury that Heidler's records showed that he had "attempted on several occasions to smother his sister," "bec[ame] involved in fights in school," and "was engaged in suicidal and homicidal episodes when he was eight and nine years old."

Dr. D'Alesandro described Heidler's suicidal episodes. He said that "[t]here were indications from the record that at times past [Heidler] would stand in the middle of the road waiting for a car to try and hit him," and one time, "a tractor-trailer jackknifed in [an] attempt[] to avoid hitting him." Dr. D'Alesandro testified that Heidler had a history of "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior," and that "the first time [he] saw him [Heidler] had cigarette burns up and down his arms," which "certainly would signify self-mutilation." And Dr. D'Alesandro said there were at least two instances in Heidler's childhood where he "was brought to the mental health center after attempting suicide."

Thus, Dr. D'Alesandro said, there was "no question about" whether Heidler "ha[d] some mental health issues," and he thought that "there [was] sufficient clinical documentation to

substantiate a consideration of a guilty but mentally ill [verdict] if that would be the [c]ourt and the jury's decision." Dr. D'Alesandro explained that "the qualification for the guilty but mentally ill [verdict] [was] not predicated on the personality disorder, [or] on the antisocial," but was instead "predicated on some of the behaviors that [Heidler] demonstrated in the past," including "examples of depression that in some occasions led [Heidler] to self-mutilate or to attempt suicide." This was evidence, not of a "personality dysfunction," but of a "mental disorder."

On cross examination, Mr. Garrett asked Dr. D'Alesandro whether he had "an opinion within a reasonable degree of psychological certainty whether the facts support[ed] a finding of guilty but mentally ill." Dr. D'Alesandro answered that he was "going to hedge on that," saying that "[t]he ultimate decision [he] th[ought] would be in the trier of fact, the jury or the judge, on whether the information [he] provide[d] me[t] that legal standard." But Dr. D'Alesandro conceded that the pretrial report that he had prepared and signed said that the facts of Heidler's case "could also support a finding of guilty but mentally ill."

And when Mr. Garrett asked whether Heidler was taking medication when Dr. D'Alesandro evaluated him, Dr. D'Alesandro answered that he "believed he was" but couldn't recall the name of the medication. Dr. D'Alesandro told the jury that Heidler "conceivably could have been" taking Haldol at the time, which he explained was "an antipsychotic medication" that "help[ed a patient] reorganize or organize their thinking process" and "aid[ed] in

behavioral control." Dr. D'Alesandro assumed that "the physician that consults with the jail probably" prescribed Haldol to Heidler.

On cross examination by the state, Dr. D'Alesandro conceded that he "wouldn't know" if Heidler had fooled him about his mental illness since "[t]hat's the nature of being fooled," but that he "felt [Heidler] was fairly forthcoming" during his two clinical interviews and didn't think Heidler tried to "fool" him. While "[t]here were some indications that [Heidler] may have been not totally cooperative," "for the most part [Dr. D'Alesandro] w[as] able to get enough information [that he] felt comfortable in [his] assessment." And based on his interaction with Heidler "in the last several months," Dr. D'Alesandro thought that "the symptoms [of Heidler's mental illness] seem[ed] to be somewhat in remission" because "[s]ome of the things that [they] looked at or [they] saw from early childhood d[idn]'t appear to be happening right now" and the seriousness of his mental illness was "not so bad that he require[d] hospitalization."

*Dr. Ifill*

Dr. Ifill, a board-certified psychiatrist at Georgia Regional Hospital in Savannah, testified that he and Dr. D'Alesandro performed a psychiatric evaluation of Heidler. Dr. Ifill explained that their evaluation of Heidler consisted of "a review of an extensive number of reports from several sources," "two separate interviews," "the completion of a mental status examination," and "a complete neurological evaluation" to "rule out organic brain damage." The records that Dr. Ifill reviewed included "reports from

school," "reports from DF[A]CS," reports from mental health centers, "reports from the police investigations," and "a report from a private psychiatric evaluation."

Dr. Ifill testified that he asked Heidler "a lot of questions about his background, his childhood, his upbringing, [and] his family relationships" and reviewed "[m]any records . . . with regard to his childhood, treatments received, referrals made, [and] evaluations that were done." Dr. Ifill also "reviewed some historical information which described some bizarre behaviors" and "behaviors [that were] out of control and self-destructive." The records showed that Heidler had exhibited "these kinds of behaviors since childhood." Dr. Ifill "found that [Heidler] was suffering from severe emotional disorders beginning in childhood and continuing up until the present." Like Dr. D'Alesandro, Dr. Ifill said that he saw self-inflicted cigarette burn marks on Heidler's skin. Dr. Ifill also told the jury that Heidler's "history recorded recurrent thoughts of wanting to kill himself and several attempts to do so," including a time when he was admitted to "the hospital in Savannah."

Dr. Ifill testified that Heidler's childhood records "indicated that the household was chaotic, disorganized, that [Heidler] was unable to get the ordinary nurturing that a growing child would need to have for normal development in the household, [and] that there was violence or threats of violence or neglect within the household." He said that the records also "suggested that there was a lot of drinking in the home, there was alcoholism in the

household." And he said that the records "indicated emotional and physical abuse." According to Dr. Ifill, Heidler's childhood environment was "likely . . . a significant contributing factor" to Heidler's personality disorders.

Based on his evaluation, Dr. Ifill concluded that Heidler "was suffering from many elements of the borderline personality disorder" but was "able to distinguish between right and wrong" and was not "mentally retarded." Dr. Ifill thought that Heidler was "responsible" for his actions and was not "insane." Dr. Ifill testified that Heidler had "a long history of out of control behavior" and "discreet episodes of bizarre behavior." But Dr. Ifill said that he did not have any evidence that Heidler was suffering a "psychotic episode" on the night of the murders and that he did not think that a psychotic episode had anything to do with Heidler's actions that night. And as to Heidler's neurological examination, Dr. Ifill said that the results "were all normal."

On cross, Dr. Ifill testified that there was "one reference to one of the evaluations where [Heidler's] behavior at one point might have been thought of being psychotic." He also explained that "there are many instances where a person who is not normally psychotic may have psychotic episodes." Mr. Garrett also asked Dr. Ifill if those suffering from a personality disorder may be "triggered into a psychotic episode." In response, Dr. Ifill said: "[t]here is only one personality disorder with which a brief or transient psychotic episode is associated[,] . . . and that is the borderline personality disorder."

When asked by Mr. Garrett whether he had an opinion about "whether [Heidler] would be eligible or meet the criteria as [he] underst[ood] the[m] for guilty but mentally ill under Georgia law," Dr. Ifill answered that Heidler "d[id] not qualify on the basis of a serious mental disease or disorder of thinking or mood," but "[w]hether a personality disorder [would] qualify [he] l[eft] to the judgment of the trier of fact and to the [c]ourt." When Mr. Garrett pointed out that Dr. Ifill had signed a report stating that the evidence in Heidler's case "could support a verdict of guilty but mentally ill," Dr. Ifill said that the evidence "could be considered . . . in making such a decision."

*Dr. Kuglar*

Dr. Kuglar, a psychiatrist, testified that he examined Heidler and reviewed Heidler's records, including reports from Georgia Regional Hospital in Savannah, written neurological reports from Central State Hospital, and "some reports by Dr. James Maish." Dr. Kuglar testified that Heidler's records showed he "had a terrible childhood . . . . He was sort of kicked around from pillar to post, his home environment was not very good, et[ ]cetera." Dr. Kuglar said that Heidler "was constantly . . . off and on during those years threatening to kill himself, doing disruptive things." Heidler had been "admitted after some sort of self-harm attempts on a couple of occasions to the Regional Hospital, and at times he was threatening to kill other people."

When he interviewed Heidler, Dr. Kuglar saw "where [Heidler] had cut himself and what appeared to be cigarette burns,

some kind of burns on his body, and where he had . . . pick[ed] at small lesions on his face until he had sort of created sores." Dr. Kuglar said that while Heidler's behavior "was certainly a little bit weird, odd, or bizarre" when he interviewed him, Heidler "presented himself as someone who was in contact with reality at the time that [Dr. Kuglar] talked to him." Dr. Kuglar also said that Heidler "seemed to show . . . some probable degree of depression." It "was [Dr. Kuglar's] understanding that [Heidler] had been on some medicine while he was incarcerated in the county detention center."

Dr. Kuglar said that during his interview, Heidler "basically indicated that he committed the crime with which he [was] accused, that he did the actual acts" because "he was upset over the very recent death of his infant child by a lady who was not part of the crime scene . . . and that he was upset because of conflicts between one of the young ladies who was killed by him who was about age [fifteen] or [sixteen] . . . and his other girlfriend."

Based on his evaluation, Dr. Kuglar concluded that Heidler "d[id] not meet the [s]tate of Georgia's criteria for a defense of being not guilty by reason of insanity" because "he d[id] not have a mental illness which prevent[ed] him from appreciating the difference between right and wrong, nor d[id] he have delusions, that is, ideas that exist[ed] only in his head which played a role in the alleged crime." Dr. Kuglar did not think that Heidler was mentally disabled.

But Dr. Kuglar testified that Heidler met the criteria for a guilty but mentally ill verdict based on his "primary diagnosis" of borderline personality disorder. Dr. Kuglar also explained that people with borderline personality disorder have "very poor" judgment, "often make poor decisions," and have "outbursts of anger" which they "certainly have a problem controlling." Dr. Kuglar explained that people with borderline personality disorder "often have very brief episodes of being psychotic." Dr. Kuglar said that Heidler talked about "the hearing of voices" and hearing "a baby crying," but Dr. Kuglar thought that "based upon the time and other things [that he] c[ouldn't] be absolutely certain that what [Heidler was] saying [was] true there."

### Mr. Garrett's Closing Argument

In his guilt-phase closing argument, Mr. Garrett explained to the jury that all he was "asking for in this case[] [was] a verdict based on the evidence." He noted that Heidler was not "trying to get away with murder." Heidler had "told the police what happened." "It is obvious," Mr. Garrett said, "that there is overwhelming evidence that [Heidler] did it." Mr. Garrett explained that he "would be insulting [the jury] if [he] said find him not guilty." So, rather than focusing on guilt, Mr. Garrett argued that "[t]he issue in this case [he] th[ought] that [the jury] should pay the most attention to and spend the most time on [was] whether [Heidler] was mentally ill as defined by Georgia law when these acts occurred."

To support this guilty but mentally ill defense, Mr. Garrett highlighted: (1) Dr. D'Alesandro's testimony that there was

evidence from which the jury could determine that Heidler was guilty but mentally ill; (2) Dr. Ifill's testimony that there was evidence that could support a guilty but mentally ill verdict; and (3) Dr. Kuglar's testimony that Heidler met the criteria for being mentally ill at the time of the offense. Mr. Garrett argued that, although Drs. D'Alesandro and Ifill had hedged their opinions on whether Heidler qualified for a guilty but mentally ill verdict as being "for the jury" to decide, they only hedged their opinions because they did "not want to do what we lawyers call invading the province of the jury."

Mr. Garrett pointed to testimony about how Heidler said "he just went berserk" and how Heidler described the scene as "like being in a dream." He reminded the jury of expert testimony that Heidler was "self-abusive, that he mutilate[d] himself, he burn[ed] himself with cigarettes, he cut[] himself on the arms, . . . [and he] pick[ed] at his face until there [were] open sores." Mr. Garrett recalled the expert testimony about Heidler's self-mutilation and the testimony that Heidler "began at the age of eight and nine to show bizarre and self-destructive behavior," including standing "out on the highway in front of trucks and [not] mov[ing]." Mr. Garrett also emphasized Dr. D'Alesandro's testimony that Heidler was being given Haldol, a "very strong antipsychotic drug." Mr. Garrett ended his closing argument by asking the jury to "consider the very strong and unrebutted evidence that [Heidler] was mentally ill as defined by Georgia law at the time" of "this horrible tragedy" in rendering its verdict.

<u>The jury's verdict</u>

The jury returned a unanimous guilty verdict on four counts of malice murder, three counts of kidnapping, one count of aggravated sodomy, one count of aggravated child molestation, one count of child molestation, and one count of burglary. The jury did not find that Heidler was guilty but mentally ill.

<u>The state's penalty phase presentation of aggravation evidence</u>

Then, the penalty phase began. The state called five witnesses: (1) a patrol officer with the Toombs County Sheriff's Office who testified that he found a "shank" hidden in Heidler's prison uniform; (2) a booking officer at the Toombs County Detention Center who testified that Heidler said he "wasn't through collecting souls" and likened himself to a fictional character who "went around killing families while they slept"; (3) a jailer at the Toombs County Detention Center who testified that Heidler had removed the brass locks from his cell door, placed them in a sock, and threatened to kill the jailer and other prison officials; (4) a jail administrator at the Toombs County Detention Center who testified that Heidler had removed locks from his cell door and had also escaped from the jail for almost twelve hours by sawing through a bar of his cell window with a hacksaw blade; and (5) a prosecutor with the Georgia Bureau of Investigation who testified that Heidler called him from prison and identified himself by saying "nine little piggies, four dead" in reference to the Daniels family.

<u>Trial counsel's penalty phase presentation of mitigation evidence</u>

Mr. Garrett and Ms. Palmer called nine witnesses, including Heidler's family members, DFACS workers, and Dr. Maish, to testify about Heidler's difficult childhood and mental health problems. They also introduced Heidler's mental health and DFACS records.

*Mary Mosley*

Mary Mosley, Heidler's mother, testified about Heidler's upbringing and his mental health. She testified that she divorced Heidler's father when Heidler was four years old. Mrs. Mosley said that Heidler's father was an alcoholic and "wasn't all that good" to their children. When Heidler was six years old, Mrs. Mosley married Heidler's stepfather. She said that Heidler's stepfather was also an alcoholic, but he "didn't beat [Heidler]" and only sometimes got into "fusses" and used "bad words" with Heidler.

Mrs. Mosley testified that Heidler "had mental problems" growing up. Mrs. Mosley told the jury that Heidler had attempted to commit suicide by "jump[ing] in front of a semi truck on a main highway" and by "tr[ying] to hang hi[m]self by a store to get attention from people at the store." She also testified that Heidler had "imaginary friends" since he was a small child. Mrs. Mosley added that Heidler was "really upset" after his son was stillborn.

*Lisa Aguilar*

Lisa Aguilar, Heidler's sister, testified about their childhood. She explained that their family "move[d] a lot," that their father

"was a[n] alcoholic," and that their stepfather "did drink." She also said that their stepfather "was mean to everybody" but "only talked" and "never hit [her] or nobody." Ms. Aguilar did not remember whether Heidler had been hospitalized because of a suicide attempt. She asked the jury not "to kill [her] brother."

*William Johnston*

William Johnston was a program manager with the Georgia Department of Juvenile Justice who had worked with Heidler and his family. Mr. Johnston testified that Heidler entered the juvenile justice system at age fourteen or fifteen because of an "altercation" between Heidler and his stepfather. Mr. Johnston supervised Heidler after he was placed on probation.

Mr. Johnston testified that he went to Heidler's home and could tell "from the odor and from discussions" that Heidler's stepfather had been drinking. He also said that "there was some discussion" that Heidler's family "may [have] be[en] involved in . . . devil worship." Mr. Johnston testified that Heidler's family "move[d] a lot" and normally lived in "small houses" that were in "poor" condition. But Mr. Johnston testified that Heidler "didn't give any indication that he had a problem with his family."

When Ms. Palmer asked Mr. Johnston if he remembered taking "action" to have Heidler evaluated by mental health professionals, Mr. Johnston said he did remember but that he no longer had any records on Heidler. Ms. Palmer moved for the state trial court to allow her to question Mr. Johnston as a hostile witness because "his answers [were] not those answers that he ha[d] given

[her] in the past and [she] would ask to be able to use leading questions." The state trial court granted Ms. Palmer's request, but Mr. Johnston continued to testify that he didn't remember anything else about Heidler.

### Cathy McMichael

Cathy McMichael, a social services case manager with DFACS's foster care unit, explained that she worked with Heidler's family when his sister entered foster care in 1995. During Ms. McMichael's "aftercare" visits to the family's home to check on Heidler's sister, Ms. McMichael saw Heidler but said that he did not "cause [her] any problem." Ms. McMichael also testified that she had brought Heidler's DFACS records to the trial pursuant to the state's subpoena.

### Willene Wright

Willene Wright, a social services worker with DFACS, testified that she first contacted Heidler's family in 1985 when she investigated Heidler's mother's failure to enroll her children in school after they moved to a different county. Ms. Wright testified that DFACS started another investigation of Heidler's family in 1986 because of "unsupervision of the children." In 1987, Ms. Wright "investigated a complaint concerning inadequate supervision of [Heidler]" and recommended that Heidler's mother "make an appointment with mental health" because Ms. Wright was concerned that Heidler had "some mental health problems." And in 1988, Heidler was placed into foster care, but his foster mother

requested that Heidler be removed from her home "because of be-havior."

Based on her interactions with Heidler's family, Ms. Wright said that Heidler's mother wasn't "affectionate towards [Heidler]" and wasn't a "nurturing mother." Ms. Wright explained that Heidler's mother did not "praise the children for doing good, work[] with affection, touch[] or hug[] them or show[] signs of af-fection towards the children." Ms. Wright also testified that DFACS provided Heidler's family with Christmas gifts, transporta-tion to get to and from health care and mental health care appoint-ments, and energy assistance to keep gas, lights, and heat on in their home because the family "needed that kind of assistance."

*Joanne Oglesby*

Joanne Oglesby, a DFACS employee, testified that she met Heidler in 1990 during a "child protective services case." She ex-plained that DFACS "received a report alleging physical abuse, emotional abuse, [and] neglect," and that DFACS "confirmed ne-glect" and worked with Heidler's family until the family moved to a different county.

Ms. Oglesby testified that she had received a report that Heidler "had tried to tie a rope to a tree in the yard and hang him-self" but Heidler denied that it happened when Ms. Oglesby went to investigate. And, although DFACS "had numerous reports that maybe [physical abuse] was occurring," DFACS "couldn't" confirm it. Ms. Oglesby described Heidler's family as "very closed" because "they knew how to talk to DF[A]CS and not tell them anything."

And Ms. Oglesby explained that it was "really difficult to prove" emotional abuse and neglect, even though she knew that "there [were] some issues going on with some inappropriate parenting things going on."

### Sylvia Boatright

Sylvia Boatright testified that she was Heidler's foster mother from August 1988 until March 1989, when Heidler was eleven years old. Ms. Boatright said that Heidler "was afraid of the dark and always talked about a knife cutting him, could a knife come through a ceiling and cut him." Ms. Boatright also testified that Heidler attended a school for children with learning disabilities. And she told the jury that Heidler "always had an imaginary mouse" that he would talk to.

### Marilyn Dryden

Marilyn Dryden testified that she taught Heidler during his middle school years at the Cedarwood Psychoeducational Program, which she described as a school for students "that were emotionally behavior disordered." In describing Heidler, Ms. Dryden told the jury that Heidler "was a loner" but "was not physically aggressive to the other students." She also said that Heidler would "pick at his skin 'til sometimes it would bleed" and would sometimes "arrive to school . . . with marks on his body where he apparently had carved his initials and things on his skin." According to Ms. Dryden, Heidler "would sometimes refer to some type of imaginary friend" and "act like it was in his hand and he would talk to it sometimes."

*Dr. James Maish*

Dr. Maish, the psychologist hired by Heidler's trial counsel, testified about his "extensive[]" pretrial evaluation of Heidler and his review of Heidler's background records. Dr. Maish testified that Heidler wasn't mentally disabled and didn't meet the standard for a not guilty by reason of insanity verdict because Heidler did not have "a delusional idea" or "an inability to resist the urge to . . . commit the criminal act." Dr. Maish also concluded that Heidler was competent to stand trial because Heidler "ha[d] a rational as well as reasonable understanding" of his criminal proceedings.

But Dr. Maish explained that, like Drs. D'Alesandro, Ifill, and Kuglar, he had diagnosed Heidler with borderline personality disorder and said that "apparently you have four people who came to the same conclusion" as to Heidler's diagnosis. According to Dr. Maish, having four psychologists reaching the same conclusion about an individual's diagnosis "was unheard of." Dr. Maish testified that Heidler "met eight of the nine" criteria for borderline personality disorder, including: (1) "recurrent suicidal behavior . . . or self-mutilating behavior"; (2) a "markedly and persistently unstable self-image" caused by "a chaotic type of family situation"; (3) "impulsivity in at least two areas that [were] potentially self-damaging"; (4) "affective instability due to a marked reactivity of mood"; and (5) "inappropriate, intensive anger or difficulty controlling anger."

Dr. Maish testified that Heidler met the standard for a guilty but mentally ill verdict "with plenty of room to spare." He also

explained that Heidler met the standard for a guilty but mentally ill verdict because Heidler had borderline personality disorder.  Dr. Maish described Heidler's borderline personality disorder as "severe" and said that it affected his ability to make decisions because "any kind of stress . . . [would] go[] straight to rage."

Dr. Maish testified that he did not think Heidler was "psychotic," explaining that Heidler "was never overtly psychotic at any of the six times that [he] saw him."  At the same time, Dr. Maish explained that "there are times when" people with borderline personality disorder "would probably meet the criteria for being psychotic or out of touch with reality."  Dr. Maish said that he had reviewed Heidler's records and that those records "talk[ed] of hallucinations" and "transient psychotic disturbances," but Dr. Maish didn't think that Heidler "was ever overtly psychotic" during the thirteen hours he spent interviewing him.  Dr. Maish thought it was "debatable" whether Heidler had experienced "transient, stress-related paranoid ideation or severe dissociative symptoms" because Dr. Maish "didn't see it."

Dr. Maish said that Heidler "acknowledged to [Dr. Maish] that he committed" the murders but "didn't have an answer" for why he murdered the Danielses and their two children.  Dr. Maish said that Heidler expressed remorse "about what happened" and that Dr. Maish had "seen him cry."  Dr. Maish explained that Heidler's actions on the night of the murders resulted from his "severe" borderline personality disorder that "impair[ed] virtually every area of his functioning" and "a combination" of: (1) "some

neurological difficulties"; (2) "a chaotic background in family"; (3) "the lack of a solid family background"; (4) "a father that was for the most part gone"; and (5) "emotional difficulties" and "years of being in and out of mental health centers, . . . hospitals, . . . [and] judicial settings."

*Heidler's Background Records*

At the close of their penalty phase presentation, Heider's trial counsel entered into evidence two sets of Heidler's background records. The first set was Heidler's DFACS records—over 1,100 pages worth—which Ms. McMichael had brought with her to trial pursuant to the state's subpoena. The second set was "a certified and authenticated copy of the records of the Georgia Regional Hospital . . . in Savannah," which consisted of 109 pages of documents. With that, the trial came to a close.

<u>Heidler's death sentences</u>

The jury unanimously recommended the death penalty for each of the four murders, finding two aggravating circumstances: (1) that each murder "was committed while [Heidler] was involved in the commission of other capital felonies"—the other three murders; and (2) that each murder "was committed while [Heidler] was involved in the commission of the offense of burglary of the home of Danny and Kim Daniels." The state trial court sentenced Heidler to death consistent with the jury's recommendation.[4] The

---

[4] The state trial court also sentenced Heidler to life imprisonment for kidnapping with bodily injury, twenty years for each kidnapping, life imprisonment

state trial court denied Heidler's motion for a new trial and his motion to vacate his death sentences.

<u>Heidler's direct appeal</u>

On direct appeal, the Georgia Supreme Court affirmed Heidler's murder convictions and death sentences.[5] *Heidler v. State*, 537 S.E.2d 44 (Ga. 2000). In affirming Heidler's convictions, the Georgia Supreme Court rejected Heidler's argument that his statement to police had been involuntary. *Id.* at 49–50. The Georgia Supreme Court pointed out that "[t]he police read Heidler his rights" and that Heidler "signed" the "waiver-of-rights form." *Id.* at 49. Heidler "was lucid, not intoxicated, and he appeared to understand his rights." *Id.* "He was not handcuffed, and was provided with cigarettes and a soft drink." *Id.* "He was neither coerced, threatened, nor promised anything in exchange for his statement." *Id.* Nor did he "request a lawyer or ask that the questioning cease." *Id.* Heidler's confession was voluntary. *Id.*

Against all that, Heidler pointed to the fact that, when the investigating officers asked him "about the sequence of events and why they occurred, [he] said several times that he was unsure because it was like 'a dream.'" *Id.* "One of the interrogating officers

---

for aggravated sodomy, thirty years for aggravated child molestation, twenty years for child molestation, and twenty years for burglary, with all sentences to be served consecutively.

[5] The Georgia Supreme Court reversed Heidler's conviction for aggravated child molestation because it "merged into the aggravated sodomy conviction as a matter of fact." *Heidler*, 537 S.E.2d at 55.

volunteered to 'get in the dream with him,' and Heidler claim[ed] that this was coercive." *Id.* The Georgia Supreme Court disagreed, explaining that "a review of the record show[ed] that the offer was simply an attempt on the part of the officer to prod Heidler's memory." *Id.* The Georgia Supreme Court, "[v]iewing the totality of the circumstances," concluded "that the trial court properly denied Heidler's motion to suppress his statement on the ground that it was involuntary." *Id.* at 49–50.

The United States Supreme Court denied Heidler's petition for a writ of certiorari. *Heidler v. Georgia*, 532 U.S. 1029 (2001), *reh'g denied*, 533 U.S. 965 (2001).

### F.    State Habeas Proceedings

Heidler filed a habeas petition in the Superior Court of Butts County, Georgia. Heidler asserted a general ineffective assistance of counsel claim and listed instances of his "[t]rial counsel's ineffectiveness" in forty-two bullet points. Three of the bullet points claimed that trial counsel were ineffective in their investigation and presentation at trial because they: (1) "failed to conduct an adequate pretrial investigation into the . . . defenses available to [Heidler], including but not limited to the psychological, medical, and psychiatric factors affecting [Heidler's] mental state during, before, and after his alleged participation in the murders"; (2) "failed to conduct an adequate pretrial investigation into [Heidler's] life and background to uncover and present to the jury evidence in mitigation of punishment, failed to present a complete picture of [Heidler's] background, and failed to locate, interview, and present

as witnesses numerous individuals who had compelling mitigating evidence regarding [Heidler]"; and (3) "failed to obtain those records, including educational, medical, and mental health records of [Heidler] and his family which would have assisted in formulating and supporting defenses in the guilt/innocence phase."

In another set of three bullet points, Heidler claimed that trial counsel were ineffective in failing to suppress Heidler's confession because they: (1) "failed to adequately raise and litigate that [Heidler's] statement to law enforcement was the result of an illegal arrest and should be suppressed"; (2) "failed to conduct an adequate pretrial investigation into the voluntariness of [Heidler's] statements to law enforcement personnel, and specifically failed to investigate the effect of [Heidler's] mental capacity, and his medical and psychological history on [Heidler's] mental state at the time he provided the incriminating statements"; and (3) "failed to adequately present information and evidence in pretrial motions and proceedings at trial relating to [Heidler's] allegedly voluntary waiver of constitutional rights during interrogation by police."

<u>Heidler's state habeas evidence</u>

In 2006, the state habeas court held an evidentiary hearing on Heidler's petition. At the hearing, Heidler presented live testimony, affidavits, and deposition testimony from more than thirty witnesses. Heidler's witnesses included Ms. Palmer and Mr. Garrett, one of Heidler's former foster parents, his teachers, his family members, medical providers who had treated Heidler as a child or as an inmate, two mental health experts retained by Heidler's state

habeas counsel, and Dr. Kuglar.  Most of the witnesses who testi-
fied at this state habeas proceeding hadn't spoken with Heidler's
counsel before trial and didn't testify on Heidler's behalf.  Heidler
did not present evidence on his claim that trial counsel were inef-
fective in investigating and litigating the suppression of his state-
ment to police.

*Ms. Palmer*

Ms. Palmer, who by then had become a state superior court
judge, testified that she met Heidler in jail about five days after the
murders.  During Ms. Palmer's meeting with Heidler, Heidler was
"[d]isheveled," "not willing to make any contact with [her]," and
"not helpful."  Ms. Palmer spoke with the chief jailer, who de-
scribed Heidler's strange behavior to her.  Based on her initial ob-
servations of Heidler and the chief jailer's description of his behav-
ior, Ms. Palmer "knew that [Heidler] was mentally ill."  Ms. Palmer
testified that Heidler continued to provide only "minimal infor-
mation" about his background after their first meeting.

Ms. Palmer said that she and Mr. Garrett decided that their
theory of the case would be "[t]hat [Heidler] was mentally ill and
that we were going to concentrate on the mental illness" because
"it [was] a rather difficult and bad crime, but [Heidler's] life had
been so bad, and, of course, the [s]tate's examiners said he was
mentally ill[, o]ur forensic psychologist said he was mentally ill,"
and "the court's expert witness [Dr. Kuglar] . . . said that [Heidler]
was mentally ill."

Ms. Palmer testified that she would follow up on investigative leads that Investigator Gillis identified because she was "sort of a hands-on kind of defense attorney" who "like[d] to interview and talk to the witnesses [her]self" and did not "want to depend on an investigator's little synopsis to [her] about what someone is going to say." Ms. Palmer testified about her efforts to go "door to door" in Heidler's community and schools to learn about his background. Ms. Palmer also testified about the many hours she spent piecing together Heidler's DFACS records. And when questioned about her billing records for work she performed in Heidler's case, Ms. Palmer explained that she "th[ought she] did a lot more work that [she] didn't document."

In preparing for trial, Ms. Palmer and Mr. Garrett "talked about all the witnesses and who to use and who not to use." For example, they decided to call only the DFACS caseworkers, teachers, and foster parents who "could better articulate [Heidler's] true behavior and had seen significant evidence of mental illness and could convey that to the jury in a heartfelt way." Ms. Palmer chose to call only the DFACS caseworkers who were "the most articulate," "had the most contact with Heidler," and "were the most sympathetic towards his plight." And Ms. Palmer explained that she was "trying to bring out some specific highlights" in Heidler's DFACS records through the caseworkers' testimony and "tried to hit the really tough parts, where [Heidler] was truly harmed" because "we would have spent days and days with the jury had we tried to go through that entire stack of records."

Ms. Palmer explained that she "struggled with whether or not to put [Heidler's mother] on the witness stand" because she was "explosive" and "irrational." Ms. Palmer explained that she decided to put Heidler's mother on the stand for only a few questions because "[w]e could not get to her, we couldn't ask her to ask the jury to spare her son's life," and there was not "one helpful bit of information we ever got out of that woman." Ms. Palmer testified that "everybody said that" Heidler's stepfather beat him but that Heidler's mother and Ms. Aguilar testified that his stepfather didn't abuse Heidler because of "[f]amily protectiveness."

Ms. Palmer said that she and Mr. Garrett relayed "all the bizarre episodes that happened with [Heidler] at the Toombs County Jail" to Dr. Maish. According to Ms. Palmer, she and Mr. Garrett met with Drs. D'Alesandro and Ifill and "made sure that they knew all of those kinds of things [about Heidler's behavior in prison], too." And they "spent most of [a] day" with Dr. Kuglar preparing for trial and knew that "Dr. Kuglar was totally and 100 percent convinced that . . . Heidler was very, very, very mentally ill." Ms. Palmer and Mr. Garrett also knew that Drs. D'Alesandro and Ifill "were on [their] page" about Heidler's mental health problems. Ms. Palmer confirmed that she gave Drs. Maish, D'Alesandro, Ifill, and Kuglar "everything [she] had" about Heidler's bizarre behaviors and told them about reports that Heidler had imaginary friends.

*Mr. Garrett*

Like Ms. Palmer, Mr. Garrett concluded that Heidler "obviously needed a psychological evaluation" during their first meeting because "everything he did screamed out that he was having mental health problems." Mr. Garrett said that he "couldn't communicate with [Heidler] at all" and that Heidler "didn't provide [him] with any kind of information in his case."

Mr. Garrett explained that his and Ms. Palmer's trial strategy was to approach Heidler's trial like "one long penalty phase, with the psychiatric evidence put at the front end and then mitigation put in afterwards." Mr. Garrett said that he and Ms. Palmer "believed that if [they] argued to the jury that [Heidler] was guilty but mentally ill, that it would be consistent with the evidence and that [they] would retain credibility with the jury and that perhaps the jury would be sympathetic and spare [Heidler's] life."

Mr. Garrett testified that he interviewed Drs. Maish, D'Alesandro, Ifill, and Kuglar before trial and gave them all the evidence from Ms. Palmer's background investigation. Mr. Garrett thought that all four doctors agreed that Heidler was mentally ill and he intended to use Drs. D'Alesandro's, Ifill's, and Kuglar's testimony to show "[t]hat [Heidler] was qualified for a verdict of guilty but mentally ill, that he was mentally ill at the time that the killings were committed."

Mr. Garrett "believe[d] that [he] had developed evidence that [Heidler] was at periods psychotic" and said that Dr. Maish had explained that people with borderline personality disorder "could

have psychotic features such as [they] had seen with [Heidler]," like "hallucinations and hearing voices."  Mr. Garrett testified that he had discussed Heidler's "psychotic episodes" and Heidler's "auditory or visual hallucinations" with Drs. Ifill and Kuglar but that"[e]verybody's conclusion [was] that [Heidler] could have been" having "a psychotic episode on the night of the crime" but there was "no way of knowing it."

Mr. Garrett explained that he and Ms. Palmer selected the witnesses that they called at trial based on who they "thought could help the most."  And, like Ms. Palmer, Mr. Garrett testified that "there probably was" a "significant amount of work [he] did on [Heidler's] case that [he] didn't bill for."

*Heidler's foster parents, teachers, and family members*

Heidler presented testimony from his foster parents, teachers, and family members.  Ms. Boatright, Heidler's foster mother who had testified at trial, submitted an affidavit in which she said that Heidler "spoke often about an invisible creature he called a 'mouse'" and would often "beat the mouse with a belt" as a form of disciplining the mouse.  Ms. Boatright said that she had spoken with Ms. Palmer before Heidler's trial "for a short time on the phone," and she'd spoken to Ms. Palmer again "only one more time" in the hotel lobby the night before her trial testimony.

Joan Pickren testified that she taught Heidler at the Cedarwood Center, that Heidler was "very unkempt," seemed depressed, and constantly "cut himself."  Ruth Davis, the parent liaison at the Cedarwood Center when Heidler was a student,

submitted an affidavit in which she said that Heidler "was one of the most ill, emotionally disturbed kids [she] h[ad] ever seen," "was always pretty dirty and looked sickly," "had a malnourished look about him," and "had some sort of imaginary friend" that he would talk to.

George Heidler, Heidler's father, submitted an affidavit in which he said that Heidler's mother "beat on her stomach very hard, screaming 'I'll kill this bastard'" many times while she was pregnant with Heidler. And Ms. Aguilar, Heidler's older sister who had testified at trial, submitted an affidavit in which she said that their stepfather was "usually" drinking and "was mean when he was drinking." She also said that their stepfather would hit Heidler and "threatened to kill him; he threatened to slit his throat." And Ms. Aguilar said that Heidler "talked to himself a lot."

Ms. Aguilar explained that she "did not understand the purpose of [her] testimony" when she testified at Heidler's trial and remembered that she had met with Mr. Garrett twice and had met with Ms. Palmer "for a few minutes" before she took the stand. Ms. Aguilar said that "no one had ever asked [her]" "many of the questions [she] was asked on the stand," and she "just wasn't ready to be asked so many personal questions about [Heidler]." According to Ms. Aguilar, "[i]f anyone had taken the time to prepare [her] about what [she] would be asked and why it mattered, [she] would have been able to tell the stories" that she included in her affidavit.

Elaine Towns, Heidler's aunt, submitted an affidavit in which she said that "each time [she] visited [Heidler's family], [she]

saw [Heidler's] father beating on one of his kids with a belt."  Ms. Towns also said that Heidler's stepfather "beat" Heidler and that she "saw some of the beatings when [she] was over to their house" and "saw a lot more of the marks [Heidler's stepfather] left on [Heidler]."

Junior Towns, Ms. Towns's son, submitted an affidavit in which he said that he was friends with Heidler while they were growing up.  Mr. Towns said that Heidler's stepfather "laid a hand on [Heidler] whenever any one of us got on his nerves" and would beat Heidler with "his hand, a belt, a cord, a shoe, and a water hose."  Mr. Towns also remembered that Heidler "held a pocket knife to his wrist and talked about cutting himself."

*Medical treatment providers*

Dr. Adrienne Butler, a pediatrician at Satilla Medical Center, testified that she treated Heidler when he was twelve years old.  Dr. Butler's notes from her encounter with Heidler said that "[i]n the office today he [was] obviously having auditory hallucinations," that Heidler's "eyes [were] darting," and that Heidler "smiled and respond[ed] to voices which [were] calling his name."  Dr. Butler's notes also stated that she had referred Heidler to Georgia Regional for in-patient evaluation.  Dr. Butler testified that she had an independent recollection of her encounter with Heidler because she "almost never saw a psychotic child in that setting, and [Heidler] stuck in [her] memory."  On cross examination, Dr. Butler conceded that she was "probably not" qualified to give a mental illness diagnosis.

Lisa Fesperman, a school psychologist, submitted an affidavit in which she said that she evaluated Heidler in 1988. Ms. Fesperman said that she determined "that . . .Heidler was severely emotionally disturbed," partly because he "told [her] he sometimes saw things coming off the wall."

George Dykes, a nurse at the Toombs County Detention Center, testified that Heidler told him, while he was in jail after the murders, that he was afraid to go to sleep because "he was seeing people who w[ere] trying to get him." Nurse Dykes said that he thought that Heidler was burning himself with cigarettes to help him stay awake. Nurse Dykes referred Heidler to Pineland Mental Health Center for treatment because Heidler was "hallucinating and he was hearing voices" and "continuing to injure himself."

Dr. David Faulk, a psychiatrist at Pineland Mental Health Center, submitted an affidavit in which he said that he treated Heidler five times between July 1998 and January 1999 (i.e., pending Heidler's trial). Dr. Faulk said that following his third visit with Heidler in 1998, he diagnosed Heidler with "psychotic disorder, not otherwise specified" and stated the diagnosis in his clinical notes. Dr. Faulk prescribed Haldol to "help control [Heidler's] psychotic symptoms," including seeing "visions of people" and "hear[ing] a baby crying all the time." But Dr. Faulk confirmed that Heidler's discharge diagnosis from Pineland Mental Health Center "d[id] not incorporate" Dr. Faulk's findings about Heidler's psychotic symptoms and stated only that Heidler had been diagnosed with "adjustment disorder with anxiety and antisocial personality disorder."

Dr. Faulk also noted that he "did not receive any background information" about Heidler prior to making his diagnosis.

Dr. Jack Matteson, a licensed psychiatrist at Georgia Diagnostic and Classification Prison, testified that he had been Heidler's treating psychiatrist in prison since March or April 2003 and saw Heidler "on a regular basis." Dr. Matteson testified that Heidler "ha[d] a mood disturbance as well as a psychotic disturbance" and that "[t]he psychotic component comes and goes." Dr. Matteson said that he had observed Heidler "in a psychotic state" and explained that Heidler reported "hearing voices." On cross examination, Dr. Matteson conceded that his "work with [Heidler] ha[d] been done primarily through [Dr. Matteson's] contact with him," and was "based on [Heidler's] current presentation" and not "all of [Heidler's] previous volumes of records." Dr. Matteson agreed that his "sole purpose" was to evaluate Heidler's "mental health now" and that he did not know "what sort of mental illnesses [Heidler] was suffering from at the time of the [murders]."

*Mental health experts*

Heidler's state habeas counsel retained two mental health experts to evaluate Heidler. The first, Dr. Sarah DeLand, was a board-certified forensic psychiatrist who evaluated Heidler in October, November, and December 2005—shortly before the state habeas court's evidentiary hearing. Dr. DeLand's evaluation of Heidler included a review of his medical and mental health records, school records, DFACS records, jail records, and some of the trial testimony and state habeas affidavits.

Dr. DeLand diagnosed Heidler with "schizoaffective disorder," "probable post-traumatic stress disorder," and "a borderline personality disorder." She also said that Heidler "was psychotic on every day that [she] saw him," including a time when he was "actively hallucinating while [she] was speaking to him." Dr. DeLand testified that Drs. D'Alesandro's, Ifill's, Kuglar's, and Maish's pretrial evaluations of Heidler happened while Heidler was taking Haldol, which "improve[d Heidler's] psychotic symptoms." Thus, Dr. DeLand agreed that it "would be important for those mental health experts to understand that [Heidler was] being medicated with antipsychotropic drugs."

Dr. DeLand didn't know what Heidler's mental state was on the day of the murders but she thought that, "in light of everything that [she'd] reviewed," it "would be most likely" that Heidler would meet the criteria for a guilty but mentally ill verdict. On cross examination, Dr. DeLand conceded that her diagnosis of Heidler was "on the same page" as the diagnoses of Drs. D'Alesandro, Ifill, Kuglar, and Maish. The only thing Dr. DeLand could have added to the testimony of the four mental health experts who testified at trial was "more information about the longstanding nature of [Heidler's] illness" and Heidler's "repeated psychotic episodes."

The second mental health expert retained by Heidler's state habeas counsel was Dr. John Carton, a Ph.D. in clinical psychiatry and an expert in forensic psychiatry. Dr. Carton testified that he evaluated Heidler and found him "to be a very mentally ill

individual, who struggled with a thought and mood disorder as well as a variety of other illnesses, and that there had been a longstanding history of these problems." Dr. Carton reviewed the state habeas affidavits submitted by people who had witnessed the physical abuse and "deplorable conditions" during Heidler's childhood and testified that Heidler's background "help[ed] provide" a "theory for why [Heidler] was behaving the way he was when [Dr. Carton] met him." According to Dr. Carton, the state habeas affidavits were "very important . . . in terms of corroborating what [he] was seeing in [Heidler's] history."

Dr. Carton testified that he was "certain" that, on the day of the murders, Heidler was suffering from a mental illness as defined under Georgia's guilty but mentally ill verdict statute. On cross examination, Dr. Carton explained that he "underst[ood] why [Drs. D'Alesandro, Ifill, Kuglar, and Maish] gave [Heidler] a borderline personality disorder" and that he "probably would have given [Heidler] that [diagnosis], too." But Dr. Carton said that he would have also "given [Heidler] an additional diagnosis" based on Heidler's "other mood and thought disorder symptoms."

*Dr. Kuglar*

Dr. Kuglar submitted an affidavit in which he stated that "the records [he] had at the time of [his pretrial] evaluation [of Heidler] suggested that [Heidler] experienced brief psychotic breaks during his history." But, Dr. Kuglar said, "[he] did not have background materials that indicated a history of more longstanding or recurrent psychotic episodes nor did [he] have concrete

examples or descriptions of [Heidler's] psychotic episodes that [he] could have described to a jury." Dr. Kuglar testified that Heidler's state habeas counsel had given him additional information, including: (1) letters written by Heidler to trial counsel from jail; (2) Heidler's jail medical logs; (3) Heidler's treatment records from Pineland Mental Health Center; and (4) the state habeas affidavits submitted by Heidler's foster parents, teachers, family members, and healthcare providers.

Dr. Kuglar explained that these other records "document[ed] many more symptoms of mental illness than [he] was aware existed" when he testified at Heidler's trial. For example, Dr. Kuglar explained that Nurse Dykes's affidavit stated that Heidler "reported hearing voices and seeing dead people in his cell" and that Heidler "burned himself with cigarettes in order to stay awake and avoid having dreams of people telling him to kill himself." And Dr. Kuglar noted that Heidler's letters to trial counsel said that he "was hearing voices and wanted to kill himself" and that "[t]he incident reports from the jail also recount several suicide attempts by [Heidler]."

According to Dr. Kuglar, the other records "present[ed] a fuller history of [Heidler's] psychotic episodes." For example, Dr. Kuglar pointed to Dr. Butler's observation that Heidler was "hearing voices" and "actively hallucinating" and said that affidavits from other individuals who knew Heidler "at different points in his life also describ[ed] behavior indictive of probable psychosis, such as [Heidler] carrying on conversations when no one was around,

cutting himself, and having an imaginary pet who he disciplined." Dr. Kuglar also explained that Heidler's jail records showed that Heidler was taking Haldol—an anti-psychotic medication—and that Haldol was "a likely explanation why [Heidler] was not psychotic during our meeting and why it had been 'some time' since [Heidler] heard voices." Dr. Kuglar said that he "had no knowledge that [Heidler] was prescribed Haldol" when he evaluated him.

Dr. Kuglar explained that the other records also "contain[ed] evidence that [Heidler] was suffering from an extreme mental or emotional disturbance at the time of the offense" because of the death of his stillborn son. Dr. Kuglar said that he had "recently learned that [Heidler] wrote letters to his trial attorneys, repeatedly complaining that he was hearing his baby son . . . crying for him every day" and that Heidler's Pineland Mental Health Center records "reiterate[d Heidler's] complaints that he was hearing a baby crying and also state[d] that on the night of the offense, [Heidler] woke up on top of his son's grave." According to Dr. Kuglar, "at minimum, this information indicate[d] that [Heidler's] mental health was severely impacted by the death of his child."

In sum, in his affidavit, Dr. Kuglar said that the added information that Heidler's state habeas counsel provided was "significant." If trial counsel had provided Dr. Kuglar with the same information, then Dr. Kuglar "would have testified with more certainty that [Heidler] ha[d] a serious mental illness" because the "new information confirm[ed] the presence of a thought disorder

component of his mental illness in addition to a mood disorder component."

### The state habeas court denied Heidler's habeas petition

The state habeas court denied Heidler's petition. Applying *Strickland*, the state habeas court denied Heidler's ineffective assistance of counsel claim. The state habeas court determined that trial counsel's investigation of Heidler's background and mental health wasn't deficient because trial counsel: (1) "conducted an exhaustive investigation of [Heidler's] background by interviewing family members, teachers, friends, DFACS caseworkers, and [Heidler's] juvenile probation officer"; (2) interviewed "employees of the Toombs County Detention Center"; and (3) "gathered voluminous documents from the various schools, including the psychoeducational centers [Heidler] attended, the numerous mental health centers records, DFACS records, [Heidler's] Toombs County Detention Center records[,] and medical records." The state habeas court also concluded that Heidler had not shown that he "was prejudiced by trial counsel's investigation" into his background and mental health.

The state habeas court determined that trial counsel reasonably presented evidence on Heidler's mental health during the guilt phase because trial counsel "provided all background records they obtained" to all of the mental health experts and because Drs. D'Alesandro, Ifill, and Kuglar "testified that they were aware of [Heidler's] auditory and visual hallucinations, yet they concluded that this was a feature of his [b]orderline [p]ersonality [d]isorder, in

that [Heidler] could have brief psychotic episodes." The state habeas court also found that trial counsel made a "logical and effective" strategic decision not to call Dr. Maish during the guilt phase. The state habeas court determined that Heidler wasn't prejudiced by trial counsel's presentation of his mental health "given the abhorrent nature of the crimes committed and the extensive mental health evaluations conducted by the mental health experts at trial."

The state habeas court determined that trial counsel's mitigation presentation during the penalty phase wasn't deficient because "[t]rial counsel diligently sifted through" the information they gathered during their investigation of Heidler's background and "chose the witnesses they felt would provide the best testimony." The state habeas court found that the witnesses trial counsel called during the penalty phase "testified to the terrible childhood [Heidler] had to endure and to his mental illnesses" and that trial counsel presented an "abundant amount of mitigating evidence." The state habeas court found that "trial counsel's strategy of presenting [Heidler's] DFACS records en mass, without a lengthy and cumulative review with the jury, was reasonable." And trial counsel's presentation of mitigation evidence during the penalty phase didn't prejudice Heidler, the state habeas court concluded, "given the copious amount of mitigating evidence presented at trial and the nature of [Heidler's] crimes."

The state habeas court did not specifically address Heidler's claim that trial counsel were ineffective in their efforts to suppress his statements to police. The state habeas court "deem[ed] . . .

abandoned" claims for which Heidler "failed to present evidence [to] support" at the evidentiary hearing. But the state habeas court also said that, "[u]nless otherwise specified, to the extent that [Heidler] ha[d] not briefed the other claims of ineffective assistance of counsel, [it] f[ound] that [Heidler] ha[d] failed to establish the requisite prongs of *Strickland* as to these claims."

### The Georgia Supreme Court denied Heidler a certificate of probable cause to appeal

Heidler applied to the Georgia Supreme Court for a certificate of probable cause to appeal the denial of his state habeas petition. Heidler's application did not include argument about trial counsel's alleged ineffectiveness in investigating and litigating the suppression of Heidler's statement to police. Instead, in a footnote, Heidler's application said,

> Heidler does not abandon any of the claims he previously made in his amended petition and briefs or at hearings in this case, which are not herein addressed. He incorporates by this reference all of the claims and arguments raised in his Petition, Amended Petition, Second Amended Petition, briefs and all other pleadings he has filed, and in the evidentiary hearing. Heidler requested an extension of the 30-page limit for this pleading, but was only allowed 40 pages. The page limitation has prevented him from setting out all his claims herein.

The Georgia Supreme Court summarily denied Heidler's application.

### G.  *Federal Habeas Proceedings*

Heidler filed a section 2254 petition in the Southern District of Georgia.  Heidler claimed that trial counsel were ineffective in investigating and presenting his mental health and background.  In support of his claim, Heidler asserted that trial counsel:  (1) "failed to conduct an adequate pretrial investigation into the [s]tate's case and defenses available to [Heidler], including but not limited to the psychological, medical[,] and psychiatric factors affecting [Heidler's] mental state during, before, and after his alleged participation in the murders"; (2) "failed to conduct an adequate pretrial investigation into [Heidler's] life and background to uncover and present to the jury evidence in mitigation of punishment, failed to present a complete picture of [Heidler's] background, and failed to locate, interview, and present as witnesses numerous individuals who had compelling mitigating evidence regarding [Heidler]"; and (3) "failed to present evidence and to raise defenses at the guilt/innocence phase of the case, including but not limited to evidence and defenses based upon [Heidler's] mental state at the time of the alleged offenses, [and Heidler's] actions in the days surrounding the offense."

Heidler also claimed that trial counsel were ineffective in investigating and litigating the suppression of his statement to police. In support of his claim, Heidler asserted that trial counsel: (1) "failed to adequately raise and litigate that [Heidler's] statement to law enforcement was the result of an illegal arrest and should be suppressed";  (2) "failed to conduct an adequate pretrial

investigation into the voluntariness of [Heidler's] statements to law enforcement personnel, and specifically failed to investigate the effect of [Heidler's] mental capacity, and his medical and psychological history[,] on [Heidler's] mental state at the time he provided the incriminating statements"; and (3) "failed to adequately present information and evidence in pretrial motions and proceedings and at trial relating to [Heidler's] allegedly voluntary waiver of constitutional rights during interrogation by the police."

The district court denied Heidler's section 2254 petition. The district court denied Heidler's claim that trial counsel were ineffective in investigating and presenting evidence of his mental health because "the state habeas court's thorough discussion of [Heidler's] trial counsel's investigatory efforts" showed that the state habeas court reasonably concluded that trial counsel performed a reasonable investigation and presentation of evidence about Heidler's mental health. The district court denied Heidler's claim that trial counsel were ineffective in investigating and presenting mitigating evidence because the state habeas court didn't unreasonably decide that trial counsel's investigation and presentation of mitigation evidence was constitutionally adequate. The district court reasoned that "the record show[ed] that Ms. Palmer spoke with [Heidler's] family members, located witnesses, and found records within a timely manner" and "the state habeas court listed numerous pieces of mitigating evidence that [Heidler's] trial counsel presented in its decision," showing "that [Heidler's] trial counsel were not deficient in their investigation or presentation of mitigating evidence."

The district court denied Heidler's ineffective assistance claim relating to the suppression of his statement to police for four reasons.  First, the district court concluded that the claim was "not properly before the [district court]" because "Heidler generally raise[d] the[] claim[] in his [section 2254 petition]" but did not "provide[ a] factual basis for [it]."  Second, even if the claim had been properly pleaded, the district court concluded that the claim was unexhausted because Heidler "failed to include [it] in his application for a [certificate of probable cause to appeal to] the Georgia Supreme Court."  Third, the state hadn't waived its exhaustion defense.  And fourth, the district court found that Heidler "ha[d] not attempted to show cause and prejudice for this failure [to exhaust] or that procedural default would result in a miscarriage of justice."

The district court denied a certificate of appealability.  Heidler appealed, and we granted a certificate of appealability as to three issues:

1. Whether the district court erred in concluding that the state habeas court did not unreasonably apply *Strickland* . . . in finding that trial counsel was not ineffective in investigating and presenting evidence of Mr. Heidler's mental health for the guilt phase of the trial.

2. Whether the district court erred in concluding that the state habeas court did not unreasonably apply *Strickland* . . . in finding that trial counsel was not ineffective in investigating and presenting

mitigating evidence for the penalty phase of Mr. Heidler's trial.

3.  Whether the district court erred in concluding that Mr. Heidler did not sufficiently plead[,] and did not exhaust, his claim that trial counsel was ineffective by failing to adequately present information and evidence in pretrial motions relating to Mr. Heidler's waiver of constitutional rights during interrogation by the police.

In other words, we granted a certificate of appealability on (1) trial counsel's investigation and presentation of *mental health* evidence during the *guilt phase*, (2) trial counsel's investigation and presentation of *mental health and background evidence* in the *penalty* phase, and (3) trial counsel's efforts to exclude Heidler's statements to police.

## STANDARD OF REVIEW

"We review de novo the district court's denial of a 28 U.S.C. [section] 2254 petition." *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019). This appeal is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Id.* When a state court has adjudicated a habeas petitioner's claim on the merits, we review its decision under AEDPA's "highly deferential standards." *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Under those highly deferential standards, a federal court may not grant a section 2254 petition unless the state court's adjudication was (1) "contrary to, or involved an unreasonable application of, clearly

established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

A state court's factual findings—both express and implied—are "presumed to be correct," and the petitioner bears "the burden of rebutting [that] presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1145 (11th Cir. 2022) (explaining that the petitioner "has the added burden under [section] 2254(e)(1) of rebutting by 'clear and convincing evidence' the presumption of correctness given to state court factual findings, both express and implied"); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012) ("[O]ur review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." (quotation omitted)).

A habeas petition "must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quotation and citation omitted). The question is not whether we "believe[] the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A state court's decision is not unreasonable "so long as fairminded jurists could disagree on the correctness of the . . . decision." *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted). In other words, we may only grant habeas

relief if the state court's decision is "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn*, 141 S. Ct. at 523 (quotation omitted). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

Our focus under section 2254(d) is on the "last reasoned" state court decision. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1261 n.12 (11th Cir. 2009) (quotation omitted). When the final state court decision on the merits doesn't come with reasons—as here, where the Georgia Supreme Court summarily denied Heidler a certificate of probable cause to appeal—we "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

But, in assessing whether the state court's decision was reasonable, a "federal habeas court reviews only the state court's decision and is not limited to the particular justifications that the state court supplied." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1037–38 (11th Cir. 2022) (en banc). What that means is that we look to "the *reasons* for the state court's decision" and then "consider any potential *justification* for those reasons." *Id.* at 1036. So, for example, if "the specific reason for a state court's decision to deny habeas relief was that the petitioner wasn't prejudiced by his counsel's deficient performance, we can, in evaluating whether that reason was reasonable, consider additional rationales that

support the state court's prejudice determination." *Id.* at 1036 (cleaned up). And we defer to the state court's determination so long as it was not "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Id.* (quotation omitted).

## DISCUSSION

Our review is limited to the three issues specified in Heidler's certificate of appealability. *Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the [certificate of appealability]."). First, we conclude that the Georgia Supreme Court did not unreasonably apply *Strickland* in denying Heidler's claim that trial counsel were ineffective in investigating and presenting evidence of his mental health during the guilt phase of trial. Second, we find that the Georgia Supreme Court did not unreasonably apply *Strickland* in denying Heidler's claim that trial counsel were ineffective in investigating and presenting mitigating evidence in the penalty phase of trial. And third, even if Heidler sufficiently pleaded and exhausted his claim that trial counsel were ineffective in failing to suppress his inculpatory statements to police, we explain that the claim fails on the merits under de novo review.

But before we get there, we'll start with the law that governs Heidler's ineffective assistance of counsel claims. Under *Strickland*, "[a] petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice—that

counsel's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hitchcock v. Sec'y, Fla. Dep't of Corr.*, 745 F.3d 476, 485 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687–88). "Because the failure to demonstrate either deficient performance or prejudice is dispositive . . . , there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one." *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (cleaned up).

The performance inquiry is "highly deferential," and courts must not succumb to the "all too tempting" impulse "to conclude that a particular act or omission of counsel was unreasonable" after counsel's defense "has proved unsuccessful." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "No absolute rules dictate what is reasonable performance for lawyers." *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (en banc) (citing *Strickland*, 466 U.S. at 688–89). Instead, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.

In short, if a reasonably competent attorney in counsel's shoes could—but not necessarily would—have performed the same, then the representation was adequate. *See White v.*

*Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (referring to "[a] standard of reasonableness applied as if one stood in counsel's shoes"). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110 (quotation omitted).

In reviewing a state court's determination that an attorney's performance was not unreasonable, we decide only whether the state court's conclusion about reasonableness was *itself* reasonable. *See* 28 U.S.C. § 2254(d)(1). So we give "both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quotation omitted). In other words, "because the standards created by *Strickland* and [section] 2254(d) are both highly deferential," our review is "doubly" deferential "when the two apply in tandem." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1265 (11th Cir. 2020) (cleaned up).

As to *Strickland*'s second prong, the prejudice inquiry doesn't ask whether "the errors had some conceivable effect on the outcome of the proceeding." *See Strickland*, 466 U.S. at 693. Instead, where a defendant challenges a death sentence, we ask "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hitchcock*, 745 F.3d at 485 (quoting *Strickland*, 466 U.S. at 695). "A reasonable probability means a substantial, not just conceivable,

likelihood of a different result." *Shinn*, 141 S. Ct. at 523 (quotation omitted). "It is a 'probability sufficient to undermine confidence in the outcome.'" *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1210 (11th Cir. 2021) (quoting *Strickland*, 466 U.S. at 694).

### A. *Heidler's Claim that Trial Counsel Were Ineffective in Investigating and Presenting Evidence of His Mental Health During the Guilt Phase*

With that, we turn to Heidler's claim that trial counsel were ineffective in investigating and presenting evidence of his mental health during the guilt phase of his trial. Because the Georgia Supreme Court summarily denied that claim, we look to the "last reasoned" state court decision. *See McGahee*, 560 F.3d at 1261 n.12. In our case, that's the state habeas court's decision. The state habeas court denied Heidler's claim, reasoning that Heidler failed under *Strickland*'s performance and prejudice prongs. We conclude that fairminded jurists could agree with those determinations about the guilt phase: that trial counsel's investigation was not deficient, that trial counsel's presentation was not deficient, and that Heidler has failed to show that he suffered any prejudice.

### Deficiency – Investigation

The state habeas court concluded that Heidler's trial counsel's investigation into his mental health for the guilt phase was not deficient. Under our "doubly" deferential standard of review, we can't say that the state habeas court unreasonably concluded that trial counsel weren't deficient under the circumstances. *See Jenkins*,

963 F.3d at 1265 (quoting *Harrington*, 562 U.S. at 105).  Mr. Garrett and Ms. Palmer thoroughly investigated Heidler's mental health.

For starters, both Mr. Garrett and Ms. Palmer visited Heidler in jail within days of the murders.  Even based on those initial meetings with Heidler, Mr. Garrett and Ms. Palmer were "totally convinced" that Heidler was mentally ill.  Ms. Palmer, for example, saw that Heidler "was making babies out of toilet paper and doing strange things in his cell."  Ms. Palmer continued to visit Heidler every six weeks or so and talk with the chief jailer every Thursday "to see how [Heidler] was doing, was he taking his medication."  Mr. Garrett also met with Heidler at least a dozen times before the trial.  Trial counsel concluded that Heidler "obviously needed a psychological evaluation."

Trial counsel's mental health investigation also included interviewing Heidler's family members, including his mother, aunt, uncle, and his sister, Lisa Aguilar.  Ms. Palmer recounted that Heidler's "family members" all said "[t]hat he had always been mentally ill."  At the same time, Heidler's family members "weren't real helpful" with giving "specific examples of mental health problems."  Ms. Palmer also spoke with some of Heidler's teachers and foster parents.  One of those teachers, Ms. Dryden, worked with Heidler at the Cedarwood School for "mentally ill students."  Ms. Dryden was able to talk about "how sick [Heidler] was during the time."  And one of Heidler's foster parents, Ms. Boatright, explained that Heidler "hallucinated that he had this pet friend that was [a] white mouse."  To gather more information,

Ms. Palmer also went "to the jails," to the "Juvenile Court," and to the DFACS to speak with caseworkers and gather Heidler's records. And she hired Investigator Gillis, who sought out Heidler's "aunts and uncles and cousins" and some of Heidler's friends.

Heidler's trial counsel also collected extensive records from DFACS, medical service providers, mental health centers, and schools (including psycho-educational centers). For example, trial counsel received records from:

> (1) Harrell Psychoeducational Program; (2) First District Cooperative Educational Service Agency; (3) Appling County Special Education Program; (4) Okefenokee RESA Child Development Center; (5) Bacon County Elementary; (6) Jeff Davis Middle School; (7) Georgia Regional of Savannah; (8) Cedarwood Psychoeducational Program; (9) Daisy Youth Clinic (Satilla Community Mental Health); (10) Bacon County Juvenile Court; (11) DFACS [in] Appling, Bacon and Jeff Davis Counties; (12) Pineland Mental Health; and (13) Toombs County Detention Center.

These records revealed, for example, that Heidler was "extremely suicidal," that he "kill[ed] animals," that he "attempt[ed] to harm himself" by "standing in front of logging trucks" and tying "a rope around his neck," and that Heidler had "tremendous [amounts] of pent up anger . . . that exhibit[ed] itself in inappropriate and sometimes psychotic manners." The records also included Heidler's medication log from while he was detained pending trial, which showed that he was prescribed Haldol, "an antipsychotic

medication." Trial counsel also collected letters that Heidler had sent to them leading up to trial, including a letter in which Heidler said that he "hear[d] a dead baby crying."

In assessing Heidler's mental health, trial counsel also hired two experts. Specifically, Mr. Garrett retained Drs. Maish and Olson to evaluate Heidler. Mr. Garrett testified that he and Ms. Palmer gave Dr. Maish reports of Heidler's behavior in jail and "all documents" comprising Heidler's background records. Dr. Maish met with Heidler six times, interviewed him "extensively," and gave him a "battery of tests." Mr. Garrett also retained Dr. Albert Olson to evaluate Heidler for "pathological issues," "brain damage," or a "head injury" and to do "neurological testing." Beyond hiring experts, Mr. Garrett also interviewed the court-appointed experts, Drs. D'Alesandro, Ifill, and Kuglar, and gave them Heidler's background records too.

In short, the record shows that trial counsel's investigation of Heidler's mental health was comprehensive and thorough. We've previously held that similar—and even less extensive—investigations were constitutionally adequate. *See, e.g.*, *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1331 (11th Cir. 2013) ("The state habeas court's finding of no deficient performance was also reasonable with respect to trial counsel's mental health investigation, which included obtaining [the petitioner's] mental health records and consulting with [an expert]."); *Raheem v. GDCP Warden*, 995 F.3d 895, 919 (11th Cir. 2021) (finding that trial counsel "conducted an extensive [and adequate] investigation into [the petitioner's]

mental health before trial" where trial counsel "consulted with *four* different mental health experts," "spoke with [one of the experts] often," and "me[t] with [the petitioner's] family"). The state habeas court's conclusion that trial counsel performed an adequate investigation of Heidler's mental health was not unreasonable.

In response, Heidler makes six main arguments—all unpersuasive. First, Heidler argues that trial counsel "[f]ailed to investigate and develop evidence of Heidler's continuing severe mental illness while awaiting trial." But trial counsel *did* investigate Heidler's mental health as he awaited trial. For example, Mr. Garrett and Ms. Palmer visited Heidler every few weeks. At these visits, trial counsel learned that Heidler "was making babies out of toilet paper and doing strange things in his cell." When they visited, trial counsel saw that Heidler "colored every cement block in [his] cell" with crayons, tore up his "sink" and "toilet," and engaged in "self-mutilation within the jail." Ms. Palmer also spoke with the chief jailer every week to check in on Heidler and whether he was taking his medication.

Heidler's trial counsel also requested—and received—at least some records from Pineland Mental Health, including Heidler's medication log from while he was detained, which showed that he was prescribed Haldol, an antipsychotic medication. The state habeas court also credited Mr. Garrett's testimony that he spoke with Nurse Dykes, the nurse at the Toombs County Detention Center, who referred Heidler to Pineland Mental Health Center for treatment. Mr. Garrett read his notes from the time as

stating that Nurse Dykes "said that [Heidler] needed to go to mental health." Given all this, we can't say that the state habeas court unreasonably concluded that trial counsel adequately investigated Heidler's mental health while he was detained pending trial.

Pushing back, Heidler faults trial counsel for "never reach[ing] out to [Nurse] Dykes or to Dr. Faulk, the treating psychiatrist." He also criticizes trial counsel for failing to collect certain records from Pineland Mental Health Center, which (among other things) documented Dr. Faulk's findings, including a notation that Heidler appeared "psychotic." But the state habeas court found that trial counsel did reach out to Nurse Dykes. Even if Heidler could undermine that finding by clear and convincing evidence—and even if trial counsel failed to interview Nurse Dykes and Dr. Faulk and failed to obtain certain Pineland Mental Health records—that wouldn't render the state habeas court's decision unreasonable. *See Valdez v. Cockrell*, 274 F.3d 941, 951 n.17 (5th Cir. 2001) ("[I]t is possible that, while the state court erred with respect to one factual finding under [section] 2254(e)(1), its determination of facts resulting in its decision in the case was reasonable under [section] 2254(d)(2).").

Here's why. We'll start with the interviews. "A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (quoting *United States v. Decoster*, 624 F.2d 196, 209 (D.C. Cir. 1976) (en banc)). Here,

Nurse Dykes referred Heidler to Pineland Mental Health Center because Heidler was "hallucinating and he was hearing voices" and "continuing to injure himself." And Dr. Faulk diagnosed Heidler with "[p]sychotic [d]isorder" and prescribed him Haldol to "help control [Heidler's] psychotic symptoms," including seeing "visions of people" and "hear[ing] a baby crying all the time." But trial counsel already knew about the hallucinations, self-mutilation, and signs of psychosis. The state habeas court didn't unreasonably conclude that this information was fairly known to trial counsel and was thus cumulative. *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) ("[T]here comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.").

The same goes for the Pineland Mental Health records. A petitioner can't prove ineffective assistance simply by pointing to undiscovered records that were "cumulative to what was uncovered during counsel's investigation." *Raheem*, 995 F.3d at 922; *see also Darling v. Sec'y, Dep't of Corr.*, 619 F.3d 1279, 1284 (11th Cir. 2010) ("No reasonable jurist could debate the holding that the fact that [a petitioner] now has gathered additional evidence about his [mental health] that differs in some minor respects from the evidence actually presented at trial does not render his attorneys' performance deficient[.]"). And the state habeas court did not err in finding that the Pineland Mental Health records were cumulative to what trial counsel already discovered. Those records generally reflected that Heidler experienced "suicidal/homicidal ideations," had "attempted suicide" in the past, displayed "antisocial

personality traits," was diagnosed with "antisocial personality dis-order," "[r]eport[ed] hearing voices and seeing things" (including "a baby cry"), showed signs of "psychosis," and was prescribed "Haldol." But counsel were already aware of these things. And they already had *five* mental health experts evaluating Heidler. Trial counsel were not required to "scour the globe on the off chance" they'd find more evidence of what they already knew. *Rompilla*, 545 U.S. at 383. At the very least, the state habeas court was not unreasonable in concluding as much.

Second, Heidler similarly points to other witnesses that (in his view) trial counsel should have interviewed—like Dr. Butler (a pediatrician who treated Heidler when he was twelve and saw him experiencing "auditory hallucinations"), Ms. Fesperman (a school psychologist whom Heidler had told he "sometimes saw things coming off the wall"), and Ms. Pickren (a teacher who saw Heidler's "severe depression"). Heidler says that trial counsel's fail-ure to interview these people rendered their investigation consti-tutionally inadequate.

Heidler's argument doesn't work. For one thing—this bears repeating—trial counsel were aware of Heidler's mental health problems and made them a focal point of trial. And so the state habeas court did not unreasonably conclude that these accounts were "fairly known" to trial counsel. *See Eggleston*, 798 F.2d at 376 (quotation omitted). For another, while Heidler faults trial counsel for not interviewing some witnesses who (he says) would have of-fered helpful testimony, trial counsel's "duty to investigate does

not necessarily require counsel to investigate every evidentiary lead." *Raheem*, 995 F.3d at 909 (quotation omitted). We must afford a "heavy measure of deference to counsel's judgments," mindful of the "reality that lawyers do not enjoy the benefit of endless time, energy, or financial resources." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (cleaned up). Here, trial counsel interviewed Heidler's family, friends, teachers, and foster parents. They went door to door around the community, and they spoke to people at the jails, the juvenile court, and DFACS. They hired two mental health experts and worked closely with three others. They collected binders (and binders) of Heidler's records. We can't say that the state habeas court unreasonably found this sufficient.

Third, Heidler asserts that trial counsel performed unreasonably because they "failed to ensure the experts had additional important information, such as Heidler's own letters documenting ongoing psychosis." In those letters, Heidler said he could hear his stillborn baby crying. But Ms. Palmer testified at the state habeas court hearing that the "letters that [Heidler] had written to [trial counsel] . . . were . . . turned over to Dr. Maish and the other mental health expert[s]." And the state habeas court credited this testimony. Even if Heidler could show by clear and convincing evidence that this finding was erroneous (and we doubt he could), the evidence shows that the experts were equipped with the knowledge that Heidler suffered from hallucinations. By the time they testified at trial, for example, Dr. Kuglar knew about Heidler's "auditory delusion[s]," including a "baby crying"; Dr. D'Alesandro was aware that Heidler was taking medication that "conceivably

could have been" Haldol, an antipsychotic; and Dr. Maish had seen "talk in the records" of "hallucinations" and "psychotic disturbances." The state habeas court did not unreasonably conclude that trial counsel adequately prepared the experts.

Fourth, Heidler argues that the state habeas court's factual findings about the scope of trial counsel's pretrial investigation are clearly erroneous. Specifically, Heidler argues that the state habeas court: (1) "ignored the fact that many of [trial counsel's] conversations [with witnesses] happened in the middle of trial and that most of their witness contacts failed to cover critical mitigation topics"; (2) "credited" trial counsel with hiring Investigator Gillis even though Investigator Gillis "did practically no work on this case"; and (3) "took at face value" Ms. Palmer's testimony about her investigation even though Ms. Palmer's billing records didn't corroborate her testimony.

But Heidler hasn't shown by clear and convincing evidence that the state habeas court's factual findings about the scope of trial counsel's investigation were incorrect. *See* 28 U.S.C. § 2254(e)(1). To the contrary, the state habeas court's factual findings are supported by Ms. Palmer's testimony at the state habeas evidentiary hearing about the pretrial interviews she conducted, her preference not to rely on Investigator Gillis to interview witnesses, and that she "did a lot more work" than what was documented in her billing records. We have "no license" to question the state habeas court's determination that Ms. Palmer's testimony was credible. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C.

[section] 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Fifth, Heidler asserts that the state habeas court unreasonably "blamed [him] for [trial] counsel's own deficiencies during the investigation" because Heidler's inability to communicate was "a symptom of his illness, not an 'unwillingness to cooperate'" and because "even if Heidler had intentionally withheld information, counsel would still be obligated to conduct a reasonable investigation." Heidler is correct that his lack of assistance did not relieve trial counsel of their duty to perform a reasonable investigation. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation.").

But the state habeas court didn't conclude that Heidler's inability or unwillingness to assist his counsel's investigation obviated counsel's duty to reasonably investigate his mental health. Instead, the state habeas court considered Heidler's lack of cooperation as context for *assessing* the reasonableness of trial counsel's investigation. This was not unreasonable. *See Johnston v. Singletary*, 162 F.3d 630, 642 (11th Cir. 1998) ("In practical terms, counsel's ability to present certain types of evidence may be informed, if not sharply curtailed, by a client's refusal to cooperate"); *Thomas v. Wainwright*, 767 F.2d 738, 743 (11th Cir. 1985) ("A criminal defendant's unreasonable refusal to communicate or cooperate with his

attorney is one of the 'circumstances' that must be considered in determining whether an attorney's assistance was reasonably effective."); *Gardner v. Ozmint*, 511 F.3d 420, 427 (4th Cir. 2007) ("[W]hen determining whether counsel has delivered a constitutionally deficient performance, a state court also may consider a defendant's own degree of cooperation[.]"); *Lorraine v. Coyle*, 291 F.3d 416, 435 (6th Cir. 2002) ("Trial counsel cannot be faulted for their client's lack of cooperation."); *cf. Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

And sixth, Heidler likens his case to *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), where we found that "trial counsel's mental health investigation was unjustifiably and unreasonably circumscribed." *Id*. at 1227. In *Ferrell*, trial counsel limited the mental health expert "to answering *only* two questions: [1] whether [the petitioner] was mentally retarded and [2] whether he suffered from any problems that may have affected his waiver of rights for the statements he gave to the police." *Id*. "Notably," the mental health expert "had *not* been asked to look for evidence of brain damage, was provided *no* material from counsel other than school records, and was *not* asked to perform a clinical interview, or do anything else for possible use in mitigation." *Id*. "Nor, despite [the petitioner's] obvious mental disabilities, did defense counsel ever ask any of [the petitioner's] family . . . about any topics related to [his] mental health." *Id*. at 1228.

Our case is different.  Unlike trial counsel in *Ferrell*, for example, Heidler's trial counsel (1) *did not* limit testimony to only mental retardation or competence to waive rights; (2) *did* obtain a second expert to look for evidence of "brain damage"; (3) *did* provide "several binders" of records to the experts, including DFACS records, school records, mental health records, and juvenile records; (4) *did* have their mental health expert interview their client "extensively" across six visits; (5) *did* ask family members about Heidler's  mental health; and (6) made his mental health the main focus of their investigation.  In other words, Heidler's trial counsel did all of the things that trial counsel didn't do in *Ferrell*.  This isn't a case where a criminal defendant had obvious mental health issues and trial counsel simply did nothing.  And so *Ferrell* doesn't help Heidler's claim.

## Deficiency – Presentation

The state habeas court concluded that trial counsel's presentation of mental health evidence in the guilt phase was reasonable.  Fairminded jurists could agree with that assessment.  In assessing the reasonableness of counsel's presentation, we've explained that "[i]t is especially difficult to succeed with an ineffective assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1302 (11th Cir. 2019).  Indeed, where, as here, "strategic choices"—like deciding what theories or witnesses to present—are "made after [a] thorough investigation," those decisions "are virtually unchallengeable." *Id.* (quoting *Strickland*, 466

U.S. at 690). Viewed in this light, the state habeas court's decision was not unreasonable.

As we've explained, trial counsel realized early on that Heidler was "mentally ill." Ms. Palmer testified that, as soon as she "walked in[to] [Heidler's cell] and saw [the] toilet paper babies, [she] knew that he was mentally ill." Mr. Garrett likewise testified that he knew that "mental health" would be an issue in the case "[a]lmost right away." At the same time, trial counsel recognized that it would be ineffective to argue that Heidler was innocent because "the facts were overwhelming as to what happened." So trial counsel landed on a strategy for the guilt stage of arguing that Heidler was guilty but mentally ill. In explaining this strategy, Mr. Garrett testified:

> [T]he facts were overwhelming as to what happened[,] and it was not a mental health defense so much as it was how to go through the guilt/innocence phase seamlessly connected to the penalty phase that was inevitable and . . . be consistent. And so it was really one long penalty phase, with the psychiatric evidence put at the front end and then mitigation put in afterwards. We believed that if we argued to the jury that he was guilty but mentally ill, that it would be consistent with the evidence and that we would retain credibility with the jury and that perhaps the jury would be sympathetic and spare his life.

Heidler doesn't contend that this strategy was unreasonable. Nor could he. *See Thomas*, 767 F.2d at 747 (finding that trial counsel was

not ineffective where he "advance[d] arguments at sentencing consistent with those he advanced at the guilt phase"); *Watkins v. Murray*, No. 92-4010, 1993 WL 243692, *9 (July 7, 1993) (4th Cir. 1993) ("[I]t was an eminently reasonable trial strategy to offer a theory at sentencing consistent with the theory offered at the guilt phase of the trial."); *see also* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 357–58 (1993) (noting the importance of "develop[ing] a consistent theory to be used at the guilt and penalty phases" and using as an example trial counsel "present[ing] an insanity defense at trial" and then "present[ing] additional testimony relating to the defendant's mental impairment as mitigating evidence at the penalty trial").

The state habeas court did not unreasonably conclude that trial counsel weren't deficient in implementing this strategy at trial. Starting with opening statements, Ms. Palmer told the jury that she "expected that mental health issues [were] going to be a very important part of this case." After the state rested, trial counsel then sought to present Drs. D'Alesandro, Ifill, and Kuglar during the guilt phase to prove that Heidler was mentally ill. Over the state's objection, the state trial court ruled in Heidler's favor, deciding that it would call Drs. D'Alesandro, Ifill, and Kuglar as witnesses and would permit Heidler to use the court-appointed experts to prove his mental health condition in support of a guilty but mentally ill verdict.

In light of the state trial court's ruling, Heidler's trial counsel decided not to call Dr. Maish during the guilt phase. In explaining

this decision, Mr. Garrett noted that he and Ms. Palmer "thought [Dr. Maish's] testimony was going to be the strongest." And so they "wanted to let the jury hear the mental health evidence on the front end with the other three, and then let them hear it all over again from someone who [trial counsel] thought would . . . give the strongest testimony." We can't say that the state court unreasonably found this to be an effective strategy. Indeed, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

Heidler's trial counsel then questioned the three expert witnesses, highlighting Heidler's severe mental health issues. First, Dr. D'Alesandro told the jury that he "found severe emotional problems beginning in [Heidler's] childhood" that Heidler "was still suffering from" at the time of his evaluation. Dr. D'Alesandro said that Heidler would probably be best identified as having borderline personality disorder. Dr. D'Alesandro agreed that this "severe disorder" would "influence [Heidler's] decision-making capacity." The borderline personality disorder could also make Heidler "really unstable," have "a very poor sense of themselves," "overreact to stimuli," and "at times become very dramatic" and "impulsive."

Dr. D'Alesandro testified that, "[f]rom the information [he] got, [Heidler] did experience hallucinations . . . during a time that he was doing some type of drug." Dr. D'Alesandro also testified

that, in examining Heidler's mental history, "[t]here was a suggestion" in the records that Heidler had experienced "psychotic episodes." Although he couldn't validate the psychosis, Dr. D'Alesandro explained that "people with this type of diagnosis sometimes will get to such an extreme that they may temporarily at least function in a psychotic-like state." Dr. D'Alesandro further mentioned that Heidler "conceivably could have been" taking Haldol, "an antipsychotic medication."

Dr. D'Alesandro also explained that Heidler had a history of "depression" and "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior." He told the jury, for example, that the records indicated that Heidler "would stand in the middle of the road waiting for a car to try and hit him," and one time, "a tractor-trailer jackknifed in [an] attempt[] to avoid hitting him." He also explained that "the first time [he] saw him [Heidler] had cigarette burns up and down his arms," which "certainly would signify self-mutilation." And he shared his view that "there [was] sufficient clinical documentation to substantiate a consideration of a guilty but mentally ill [verdict] if that would be the [c]ourt and the jury's decision."

Second, Heidler's trial counsel reinforced this testimony through Dr. Ifill. Dr. Ifill testified that he "found that [Heidler] was suffering from severe emotional disorders beginning in childhood and continuing up until the present." Like Dr. D'Alesandro, Dr. Ifill said that he saw "self-inflicted" cigarette burn marks on Heidler's skin. Dr. Ifill also told the jury that Heidler's "history

recorded recurrent thoughts of wanting to kill himself and several attempts to do so," including a time when he was admitted to "the hospital in Savannah." Dr. Ifill explained that he'd "found that [Heidler] was suffering from many elements of . . . borderline personality disorder."

Dr. Ifill told the jury that there "were evaluations where [Heidler's] behavior at one point might have been thought of being psychotic." He explained that "there are many instances where a person who is not normally psychotic may have psychotic episodes." Mr. Garrett also asked Dr. Ifill if those suffering from a personality disorder may be "triggered into a psychotic episode." And, in response, Dr. Ifill said: "[t]here is only one personality disorder with which a brief or transient psychotic episode is associated with, . . . and that is the borderline personality disorder." Dr. Ifill conceded that Heidler's case "could support a verdict of guilty but mentally ill."

Third, Dr. Kuglar testified (like the first two experts) that the "primary diagnosis [he] arrived at" was "borderline personality disorder." Dr. Kuglar saw "where [Heidler] had cut himself and what appeared to be cigarette burns, some kind of burns on his body, and where he had . . . pick[ed] at small lesions on his face until he had sort of created sores." Dr. Kuglar said that Heidler "seemed to show . . . some probable degree of depression" and that Heidler had previously been "admitted after some sort of self-harm attempts." Dr. Kuglar explained that people with borderline personality disorder "often have very brief episodes of being psychotic."

And he told the jury that Heidler talked about "auditory delu-sion[s]" like "hearing . . . voices" and the sound of "a baby crying." Dr. Kuglar concluded by testifying that, "[i]n [his] opinion," Heidler "would qualify for [a] guilty but mentally ill" verdict."

To end the guilt phase, Mr. Garrett gave a closing statement. Mr. Garrett explained that he was not asking the jury "to find [Heidler] not guilty" because there was "overwhelming evidence that he did it." Instead, what he was asking for was a verdict rec-ognizing that Heidler "was mentally ill as defined by Georgia law when these acts occurred." In this way, all he was "asking for in this case[] [was] a verdict based on the evidence."

Mr. Garrett reminded the jury that each of the three court-appointed experts opined that there was evidence to support a guilty but mentally ill verdict. Mr. Garrett also pointed to testi-mony about how Heidler described the scene as "like being in a dream." He reminded the jury of expert testimony that Heidler was "self-abusive, that he mutilate[d] himself, he burn[ed] himself with cigarettes, he cut[] himself on the arms, . . . [and] pick[ed] at his face until there [were] open sores." Mr. Garrett recalled the expert testimony that Heidler "began at the age of eight and nine to show bizarre and self-destructive behavior," including standing "out on the highway in front of trucks and [not] mov[ing]." Mr. Garrett emphasized the testimony that Heidler was being given Haldol, a "very strong antipsychotic drug." And he ended his clos-ing argument by asking the jury to "consider the very strong and

unrebutted evidence that [Heidler] was mentally ill as defined by Georgia law at the time" of "this horrible tragedy."

In sum, Heidler's trial counsel brought out, through the experts, (1) Heidler's depression, (2) that Heidler experienced hallucinations, (3) that he had attempted suicide on multiple occasions, (4) that he engaged in self-mutilation, and (5) that he had been prescribed a powerful antipsychotic medication. Trial counsel showed that Heidler had suffered from a severe disorder from the time he was a child through the time of trial. They also offered powerful examples: that Heidler had experienced auditory delusions like a baby crying, that Heidler self-mutilated with cigarette burns, and that Heidler had tried to kill himself as a child by walking in front of cars. We can't say that the state habeas court's conclusion that this presentation was reasonable was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *See Shinn*, 141 S. Ct. at 523 (quotation omitted).

Looking to avoid this conclusion, Heidler offers three main arguments. None of them are convincing. First, Heidler argues that trial counsel were ineffective because they didn't present evidence of his "lifelong struggles with serious mental illness marked by auditory and visual hallucinations . . . and severe depression." But trial counsel *did* present evidence of all of those things. As to the hallucinations, both Dr. D'Alesandro and Dr. Kuglar testified about Heidler's "delusion[s]" and "psychotic episodes," including the fact that Heidler was "hearing . . . voices" and the sound of "a baby crying." As to depression, Drs. D'Alesandro and Kuglar

specifically discussed Heidler's "depression." And all of the experts told the jury about Heidler's long history of "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior." It's simply not true, then, that trial counsel failed to present evidence of Heidler's hallucinations and depression.

Second, Heidler contends that trial counsel's guilt phase mental health presentation was deficient because they "effectively abdicated the development of [a guilty but mentally ill] defense to the trial court" by "relying solely on the court-appointed experts." But it was not unreasonable for the state habeas court to find that trial counsel made a "logical and effective" strategic decision not to have Dr. Maish testify during the guilt phase. Mr. Garrett testified he made this decision based on his belief that Dr. Maish's testimony was the "strongest" and his "confidence" that Drs. Ifill and Kuglar would accurately present Heidler's mental health in the guilt phase. We can't say that the state habeas court unreasonably concluded that this was a reasonable strategic decision. *See Waters*, 46 F.3d at 1512 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."); *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 649 (11th Cir. 2016) ("We . . . afford substantial deference to trial counsel's strategic decision to present [the petitioner's] mother as the only penalty phase witness."); *Fortenberry v. Haley*, 297 F.3d 1213, 1229–30 (11th Cir. 2002) ("Strategic considerations may even reasonably lead defense counsel to conclude that presenting no mitigating evidence is to the defendant's benefit.").

Third, Heidler asserts that trial counsel should have pre-sented "credible witnesses who would have given compelling tes-timony of Heidler's psychosis and major depression," including Dr. Butler, Ms. Pickren, and Ms. Fesperman.  Dr. Butler was the pedi-atrician who saw Heidler "hallucinating" when he was twelve, Ms. Pickren was a teacher who could speak to Heidler's "depression," and Ms. Fesperman was a school psychologist who said Heidler had reported "sometimes [seeing] things coming off the wall."

The problem, as the state habeas court pointed out, is that all of this testimony would have been cumulative of the evidence already presented to the jury.  "A petitioner cannot establish inef-fective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).  In general, "evidence presented in postconviction proceed-ings is cumulative . . . to or duplicative of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes pre-sented to the jury." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1260–61 (11th Cir. 2012) (cleaned up) (op. of Ed Carnes, J.). That's exactly what this added testimony would do here.  Heidler's trial counsel brought out Heidler's hallucinations and depressions at trial.  He can't show ineffective assistance of counsel by simply pointing to more or better examples.

<u>Prejudice</u>

The state habeas court's conclusion that Heidler's trial counsel did not perform deficiently at the guilt stage is sufficient to dispose of Heidler's first claim. *Windom*, 578 F.3d at 1248 ("[T]he failure to demonstrate either deficient performance or prejudice is dispositive[.]"). But the state habeas court *also* found that Heidler failed to show that he was prejudiced by trial counsel's investigation and presentation of mental health evidence during the guilt phase. We can't say that this no-prejudice determination was contrary to, or an unreasonable application of, clearly established federal law.

"[A] petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial." *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011); *see also, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 200 (2011) (finding "no reasonable probability that the additional evidence [from the] state habeas proceedings would have changed the jury's verdict" because "[t]he 'new' evidence largely duplicated the mitigation evidence at trial."); *Knight v. Fla. Dep't of Corr.*, 958 F.3d 1035, 1049–50 (11th Cir. 2020) (concluding that the petitioner failed to establish prejudice because his "'new' mitigation evidence merely strengthen[ed]—corroborate[ed], confirm[ed]—the mitigating circumstances that [counsel] presented at sentencing").

Here, as we've explained, the state habeas court did not unreasonably conclude that Heidler's preferred evidence was merely cumulative—that the evidence simply strengthened, corroborated,

or confirmed the theories already presented at trial.  For example, Heidler argues that he was prejudiced because trial counsel failed to "present[] credible witnesses—including Dr. Butler, Dr. Faulk, Nurse Dykes, and Ms. Pickren—with first-hand knowledge of Heidler's psychosis and severe depression."  But Drs. D'Alesandro, Ifill, and Kuglar testified not only that Heidler could be found guilty but mentally ill but also about Heidler's depression and psychotic episodes.  The state habeas court did not unreasonably conclude that there was no prejudice because this evidence was simply duplicative.

Along similar lines, Heidler argues that trial counsel failed to collect and present (some) Pineland Mental Health records from while he was detained pending trial.  As we've explained, the Pineland Mental Health records generally reflected that Heidler experienced "suicidal/homicidal ideations," had "attempted suicide" in the past, displayed "antisocial personality traits," was diagnosed with "antisocial personality disorder," "[r]eport[ed] hearing voices and seeing things" (including "a baby cry"), showed signs of "psychosis," and was prescribed "Haldol."  But all of this closely matched the evidence that trial counsel discovered and then presented to the jury during the guilt phase at trial.  The state habeas court did not unreasonably find no prejudice based on these Pineland Mental Health records.

More than that, the state habeas court also concluded that there was no prejudice resulting from trial counsel's failure to discover Heidler's Pineland Mental Health records from while he was

detained because those records "would not have benefited [Heidler] at trial." This conclusion was not an unreasonable one. A "reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). And here, there was plenty of bad evidence that would've sharply cut against Heidler's case. The records, for instance, reflect that Heidler's diagnosis at discharge was "antisocial personality disorder." They state that Heidler initially "[r]eport[ed] hearing voices and seeing things past three or four months" but then said that these "[v]oices *were not present prior to murders*." And the records reflect that Heidler, at one point, "denie[d] *any* auditory or visual hallucinations." The records, in other words, may very well have cut against trial counsel's theme that Heidler was likely having a psychotic episode on the night of the murders. On these facts, it was not unreasonable to find that Heidler suffered no prejudice from the absence of these records.

We've concluded that state courts have reasonably found no prejudice in similar circumstances. In *Cook v. Warden, Georgia Diagnostic Prison*, 677 F.3d 1133 (11th Cir. 2012), for example, trial counsel failed to discover "one set of mental health records" from while the defendant was "incarcerated awaiting trial." *Id.* at 1137. Trial counsel "did not know of the [mental health] records and did not present [them] to [the] [p]etitioner's [mental health expert]." *Id.* We concluded that the state court reasonably found no prejudice, though, because the mental health expert "knew much of what was contained in the . . . records." *Id.* at 1138. And the records were "unhelpful to [the] [p]etitioner's case in other ways"

because they conflicted with other evidence. *Id.* The same is true here. The experts were aware of Heidler's mental health issues during trial and the evidence in the Pineland Mental Health records would have cut against Heidler's defense at trial.

B.    *Heidler's Claim that Trial Counsel Were Ineffective in Investigating and Presenting Mitigating Evidence for the Penalty Phase of Trial*

The state habeas court found that "trial counsel's presentation of mitigating evidence [in the penalty phase] was neither deficient nor was [Heidler] prejudiced by counsel's performance." And the Georgia Supreme Court summarily adopted this conclusion. The state habeas court didn't unreasonably apply *Strickland* in denying Heidler's claim that trial counsel were ineffective in investigating and presenting mitigating evidence—including evidence of Heidler's mental health and background—in the penalty phase.

<u>Deficiency – Investigation</u>

The state habeas court found that trial counsel's investigation was "exhaustive," and its determination that trial counsel reasonably investigated Heidler's mental health and background was not contrary to, or an unreasonable application of, clearly established federal law. Mr. Garrett and Ms. Palmer performed an extensive investigation into Heidler's background. To start, both Mr. Garrett and Ms. Palmer met with Heidler. Ms. Palmer continued to visit Heidler every six weeks or so and Mr. Garrett also met with Heidler at least a dozen times before the trial.

At these meetings, trial counsel explored Heidler's background and mental health. For example, Ms. Palmer learned that

Heidler "had two brothers in jail," that his mother "practiced all kinds of magic," that Heidler was "upset" about "the baby that died," and some other "background information." She also observed Heidler's "toilet paper babies" and concluded he was "mentally ill." Mr. Garrett also tried to talk to Heidler about his background and testified that Heidler may have told him a little bit "about his family." Ms. Palmer also leveraged her connections as the contract public defender in Toombs County to speak with guards at the jail, including the chief jailer, who "described to [Ms. Palmer] that [Heidler] was not mentally well.

Heidler's trial counsel interviewed family, friends, teachers, DFACS caseworkers, and a juvenile probation officer. For example, Ms. Palmer spoke with Heidler's mother, aunt, uncle, his brother Steve, and his sister Ms. Aguilar. Ms. Aguilar, along with Heidler's aunt and uncle, "provide[d] some background information," including that Heidler was "in and out of foster care." Heidler's family members all said that "he had always been mentally ill" and that he'd been admitted to Georgia Regional Hospital twice for "mental health issues." "Everybody" said that Heidler's "stepfather had beaten" him. Heidler's brother said that "the family was dysfunctional" and that Heidler "always had problems." Trial counsel also reached out to some of Heidler's foster parents, including Ms. Boatright, who told them that Heidler "had needed more help that he had not gotten" and that he "needed to be rid of his [mother] to have any help whatsoever." Ms. Boatright also told trial counsel that "he hallucinated that he had this pet friend that was [a] white mouse."

Trial counsel also spoke with at least six DFACS employees. Ms. Palmer's notes from the time show that these DFACS employees (for example) "confirmed neglect" and explained that Heidler's mother would "threaten[]" caseworkers and use "voodoo." The DFACS employees explained that Heidler's mother "had not been a good mother at all" and that Heidler had a "pathetic life." Trial counsel's notes from interviewing Mr. Johnston, a juvenile probation officer, stated that Heidler's family "moved frequently" to "avoid unpaid bills," that Heidler had "[a]dmitted killing animals," that Heidler's mother was "unstable," and that Heidler's parents were "heavy drinkers." Trial counsel also hired an investigator, Frank Gillis, to help her "find witnesses down in the country." And Ms. Palmer literally went "door to door and around the community" to investigate Heidler's background.

Beyond interviewing Heidler and those who knew him, trial counsel also collected extensive records from DFACS, medical service providers, mental health centers, and the schools Heidler attended. For example, trial counsel received records from:

> (1) Harrell Psychoeducational Program; (2) First District Cooperative Educational Service Agency; (3) Appling County Special Education Program; (4) Okefenokee RESA Child Development Center; (5) Bacon County Elementary; (6) Jeff Davis Middle School; (7) Georgia Regional of Savannah; (8) Cedarwood Psychoeducational Program; (9) Daisy Youth Clinic (Satilla Community Mental Health); (10) Bacon County Juvenile Court; (11) DFACS [in] Appling, Bacon and

Jeff Davis Counties; (12) Pineland Mental Health; and
(13) Toombs County Detention Center.

These records, the state habeas court explained, "cover[ed] the ma-
jority of [Heidler's] childhood and teen years." The records
showed that Heidler's "mother had mistreated him and his stepfa-
ther had abused him." They indicated that Heidler had "been in
and out of care" and that he had "emotional problems from early
on." They revealed, for example, that Heidler was "extremely sui-
cidal," that he "kill[ed] animals," that Heidler's "parents [were] di-
vorced," that his stepfather was "an alcoholic" and "abusive," that
Heidler did "not attend school regularly," that Heidler's mother
was "involved in witchcraft," that his "house was" often "un-
kempt," that he "led a life of instability and turmoil," and that he
had "tremendous [amounts] of pent up anger . . . that exhibit[ed]
itself in inappropriate and sometimes psychotic manners." The
records included Heidler's medication log from while he was de-
tained pending trial, which showed that he was prescribed Haldol.
Trial counsel also collected letters that Heidler had sent to them
leading up to trial, including a letter in which Heidler said that he
"hear[d] a dead baby crying."

As we've explained, trial counsel also hired two mental
health experts as part of their investigation. Specifically, Mr. Gar-
rett retained Drs. Maish and Olson. Dr. Maish met with Heidler
six times, interviewed him "extensively," and gave him a "battery
of tests." And Dr. Olson evaluated Heidler for "pathological is-
sues," "brain damage," or a "head injury" and did "neurological

testing." Mr. Garrett also interviewed the court-appointed experts, Drs. D'Alesandro, Ifill, and Kuglar, and gave them the bulk of the background and mental health records they'd obtained from their investigation.

It's also worth placing this investigation in context. *See Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Trial counsel gathered all of this evidence despite limited cooperation. Heidler himself gave trial counsel "minimal" information. Mr. Garrett testified that he "couldn't communicate with [Heidler] at all; nobody c[ould]." This obviously posed a challenge. *See Chandler*, 218 F.3d at 1318 (explaining that "the reasonableness of counsel's [investigation] . . . depends critically upon information supplied by the petitioner" (cleaned up)). Trial counsel didn't do much better with Heidler's family. Heidler's mother never gave "one helpful bit of information." His family members would "run from you" rather than "come and pour out information." And as to everyone else, Ms. Palmer testified that "the murder was so bad a lot of people didn't want to talk to us."

Heidler's trial counsel, to sum things up, interviewed broad swaths of people in his life and obtained extensive background and mental health records. Through this investigation, trial counsel learned about Heidler's background (for example) that his mother exhibited strange behaviors, that his stepfather was an abusive alcoholic, that Heidler didn't attend school regularly, that his parents struggled to pay the bills, that his home was unkempt, and that he

bounced from place to place. They also learned about his mental health: that he exhibited psychosis, experienced depression, attempted suicide, killed animals, and otherwise had a long history of mental health issues. And they learned all this even in the face of limited cooperation. We can't say that the state habeas court's conclusion that this investigation was reasonable was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn*, 141 S. Ct. at 523 (quotation omitted).

Indeed, we've routinely found no error when reviewing similar investigations. *See, e.g.*, *Ledford*, 818 F.3d at 647–48 (attorneys interviewed the petitioner, his family, friends, and mental health experts and hired a private investigator to investigate petitioner's background); *Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1280–81 (11th Cir. 2013) (attorneys met with the petitioner, interviewed family members, hired a private investigator, and retained mental health experts); *Tharpe v. Warden*, 834 F.3d 1323, 1339 (11th Cir. 2016) (attorneys met with the petitioner and interviewed prosecutors, law-enforcement officials, former employers, friends, and family and retained an expert).

But, in Heidler's view, his trial counsel didn't do enough. First, Heidler argues that trial counsel "did not contact readily available witnesses who would have testified to the trauma of Heidler's childhood." This argument doesn't work. For starters, as we've explained, "[a] claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to

defense counsel." *Eggleston*, 798 F.2d at 376. The state habeas court's conclusion that trial counsel conducted a thorough investigation—and that Heidler failed to identify any non-cumulative evidence to be gained—was not unreasonable. For another, "[h]ow a lawyer spends his inherently limited time and resources is also entitled to great deference by the court." *Chandler*, 218 F.3d at 1318 n.22. Trial counsel conducted a comprehensive investigation. The state habeas court didn't unreasonably reject Heidler's attempt to undermine that fact by pointing to *more* people they could've interviewed. "[T]he Constitution," we've explained, "requires a good deal less than maximum performance." *See Atkins v. Singletary*, 965 F.2d 952, 959–60 (11th Cir. 1992) (noting that, "[a]t some point, a trial lawyer has done enough" and that "[a] lawyer can almost always do something more in every case").

Second, Heidler asserts that trial counsel "performed deficiently in largely neglecting to cover critical mitigation topics" with "the witnesses trial counsel did contact." Heidler points to one example—trial counsel's interview of his father—noting that his father did not remember "discussing anything about Heidler's background or childhood." This hardly shows that trial counsel were ineffective. Heidler "didn't have contact with his dad" growing up and so there would have been little reason to ask his father about Heidler's background. *See Rompilla*, 545 U.S. at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). And, in any event, pointing to a single witness doesn't say anything about all of the

discussions trial counsel had with all the other people they inter-
viewed.

<u>Deficiency – Presentation</u>

The state habeas court found that trial counsel's presenta-
tion was constitutionally adequate because they presented "sub-
stantial mitigating evidence on [Heidler's] behalf," including his
DFACS records and witnesses who "testified to the terrible child-
hood [Heidler] had to endure and to his mental illnesses."  That
was not an unreasonable determination.  Before we get to the evi-
dence presented at trial, there's one point worth noting.  "When
courts are examining the performance of an experienced trial coun-
sel, the presumption that his conduct was reasonable is even
stronger." *Chandler*, 218 F.3d at 1316.  In this case, trial counsel had
significant experience trying capital cases.  Indeed, Mr. Garrett had
defended about fifty death penalty cases, including approximately
forty that he tried first chair.  Only two of his clients (one of whom
was Heidler) had "received the death penalty."  That's not to say
that trial counsel couldn't have erred.  But it means we should be
cautious before questioning trial counsel's strategy of who to call
and when.

With that said, the state habeas court did not unreasonably
conclude that trial counsel effectively presented mitigating evi-
dence at the sentencing phase.  To begin, trial counsel's mitigation
case effectively started during the guilt phase—when trial counsel
started presenting evidence of Heidler's background and mental
health through Drs. D'Alesandro, Ifill, and Kuglar.  We may

consider this evidence—from the guilt phase—in assessing whether trial counsel effectively presented mitigating evidence for the purpose of sentencing. *See Ledford*, 818 F.3d at 648 ("It is misleading to assert that trial counsel only called one mitigation witness on [petitioner]'s behalf because several witnesses offered mitigation testimony throughout both stages of the trial."); *see also Bell v. Cone*, 535 U.S. 685, 699–700 (2002) ("Respondent's suggestion that the jury could not fully consider the mental health proof as potentially mitigating because it was adduced during the guilt phase finds no support in the record.").

Drs. D'Alesandro, Ifill, and Kuglar testified about Heidler's significant mental health issues and difficult background. Here are just a few examples. Dr. D'Alesandro told the jury that "[t]here was a suggestion" in the records that Heidler had experienced "psychotic episodes" and he explained that people (like Heidler) who have borderline personality disorder "sometimes will get to such an extreme that they may temporarily at least function in a psychotic-like state." He also testified that Heidler had a history of "depression" and "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior," and had attempted suicide. Dr. D'Alesandro also told the jury about Heidler's "chaotic" and "dysfunctional" childhood. He explained, for example, that Heidler was "shuffled from household to household, person to person." Heidler "was moved about from various foster homes after the state took custody of him from his mother." There was also "some indication of voodoo and cultism . . . that was practiced in [his] family." Dr. D'Alesandro also explained that Heidler was "[d]eprived

of the familial love and support that one normally would expect to get as he's being brought up."

Dr. Ifill likewise told the jury about Heidler's "severe emotional disorders beginning in childhood and continuing up until the present." He talked about Heidler's "self-inflicted" cigarette burns and "several attempts" to kill himself. He also spoke about "evaluations where [Heidler's] behavior at one point might have been thought of being psychotic." And he told the jury that "a brief or transient psychotic episode is associated with . . . borderline personality disorder." Dr. Ifill also testified about Heidler's difficult upbringing. He told the jury that Heidler had been "suffering from alcoholism since around the age of [eleven]." He explained that Heidler's "household was chaotic, disorganized" and that Heidler "was unable to get the ordinary nurturing that a growing child would need to have for normal development." Dr. Ifill testified that "there was violence or threats of violence or neglect within the household." He explained that Heidler's mother "believed in witchcraft." And he shared that "there was a lot of drinking in the home" and that the records "indicated neglect" as well as "emotional and physical abuse."

Then came Dr. Kuglar, who also told the jury that Heidler "seemed to show . . . some probable degree of depression," that he saw "where [Heidler] had cut himself and what appeared to be cigarette burns, some kind of burns on his body, and where he had . . . pick[ed] at small lesions on his face until he had sort of created sores," and that Heidler had talked about "auditory delusion[s]"

like "hearing . . . voices" and the sound of "a baby crying." Dr. Kuglar explained that Heidler had a "terrible childhood." He noted that Heidler had been "kicked around from pillar to post" and that his "home environment was not very good."

And the testimony about Heidler's mental health and background flowed into the sentencing phase—in which trial counsel called nine witnesses. Heidler's mother, for instance, told the jury that Heidler "had a mental problem" growing up and that he "went to a special school." She also explained that Heidler had tried to commit suicide when he was younger by "jump[ing] in front of a semi truck" and "hang[ing] himself." She also testified that she divorced Heidler's biological father when Heidler was four, that Heidler's father "was a[n] alcoholic," and that his father "wasn't all that good to none of the young'uns." Heidler's mother also shared that Heidler's stepfather was an "alcoholic." Heidler's sister, Ms. Aguilar, similarly testified that their father was an "alcoholic" and that their stepfather "was mean to everybody."

Mr. Johnston, the juvenile probation officer, testified that Heidler entered the juvenile justice system at age fourteen or fifteen because of an "altercation" between Heidler and his stepfather. He testified that he could smell "the odor" of alcohol at Heidler's house, that there were rumors that Heidler's family "may [have] be[en] involved in . . . devil worship," and that Heidler's family "move[d] a lot" and normally lived in "small houses" that were in "poor" condition. Ms. Wright, a social services worker with DFACS, testified that she first contacted Heidler's family

when she investigated Heidler's mother's failure to enroll her children in school after they moved to a different county. She testified that she later investigated a lack of "[]supervision." She explained that Heidler's mother wasn't "nurturing" and that DFACS provided "assistance" because the family couldn't keep up with bills. And she thought that Heidler suffered from "mental health problems" at age "ten."

Similar testimony about Heidler's mental health problems and terrible upbringing went on and on. Ms. Oglesby, for example, a DFACS employee, testified that DFACS "received a report alleging physical abuse, emotional abuse, [and] neglect," and that DFACS "confirmed neglect" and worked with Heidler's family until the family moved to a different county. Ms. Oglesby testified that she had received a report that Heidler "had tried to tie a rope to a tree in the yard and hang himself." And she noted that DFACS "had numerous reports that maybe [physical abuse] was occurring." Ms. Boatright, Heidler's foster mother, said that Heidler "was afraid of the dark and always talked about a knife cutting him, could a knife come through a ceiling and cut him." And she told the jury that Heidler "always had an imaginary mouse" that he would talk to. Ms. Dryden, one of Heidler's teachers, said Heidler went to a school for students "that were emotionally behavior disordered." She said that Heidler would "pick at his skin 'til sometimes it would bleed" and would sometimes "arrive to school . . . with marks on his body where he apparently had carved his initials and things on his skin." Heidler "would sometimes refer to some

type of imaginary friend" and "act like it was in his hand and he would talk to it sometimes."

Dr. Maish also took the stand. Dr. Maish said that he agreed with Drs. D'Alesandro, Ifill, and Kuglar that Heidler had borderline personality disorder and explained that such a consensus among mental health experts was "unheard of." Dr. Maish also testified that Heidler's "severe" borderline personality disorder "impair[ed] virtually every area of his functioning" and that Heidler had "some neurological difficulties." He also observed that Heidler's records "talk[ed] of hallucinations" and "transient psychotic disturbances." As to Heidler's childhood, Dr. Maish testified that Heidler had a "chaotic background in family," a "lack of a solid family background," a "father that was for the most part gone," "emotional difficulties," and "years of being in and out of mental health centers, . . . hospitals, . . . [and] judicial settings." At the close of their penalty phase presentation, Heider's trial counsel entered into evidence two sets of Heidler's background records: his DFACS records and his Georgia Regional Hospital records.

Heidler's trial counsel got all of this evidence before the jury even though they faced resistance from many witnesses. For example, some of Heidler's "foster parents . . . didn't want to have anything to do with [Heidler], nothing." Ms. Dryden, Heidler's teacher, was "very helpful" during trial counsel's investigation but then "went kicking and screaming" when it came time to testify. Ms. Dryden "was mad at [trial counsel] for subpoenaing her." But trial counsel got her to testify and "her good heart came through."

Heidler's sister didn't want to testify either.  Ms. Palmer literally "begged her to come to trial and ask the jury to spare his life."  And she did.  Mr. Johnston, the juvenile probation officer, was forthcoming about Heidler's mental health and difficult childhood when he was interviewed pre-trial, but then Ms. Palmer had to treat him as a hostile witness on the stand when he suddenly suggested he didn't know anything.  It's hard to blame trial counsel when they faced opposition at every turn.

In any event, although trial counsel faced substantial obstacles in presenting a compelling case for sentencing, they still were able to put on a strong case.  As to Heidler's mental health, they presented to the jury, by way of example, that Heidler suffered from depression, that he engaged in self-mutilation by burning and cutting himself, that he experienced hallucinations of a baby crying and of imaginary figures, that he attempted suicide by walking in front of a truck and hanging himself, that his records suggested he had experienced psychosis, and that he was prescribed a strong antipsychotic pending trial.  As to Heidler's background, trial counsel told the jury about Heidler's parents' divorce, about the drinking in his household, that his stepfather was cruel, that there were suspicions of abuse, that his life was unstable and he consistently changed homes, that his mother didn't give him the love he needed for normal development, that his family practiced witchcraft, that he was neglected, that he was addicted to alcohol by age eleven, that his family struggled to pay their bills, and that he lived in small houses that were in poor condition.  The state habeas court did not

unreasonably conclude that trial counsel performed effectively in presenting this mitigating evidence.

Against all this, Heidler raises five main arguments. First, Heidler contends that trial counsel "failed to reasonably . . . present . . . evidence" that he "suffered from depression and/or psychoses," instead painting Heidler's issues as being "limited to personality disorders marked by antisocial conduct." But that's just not true. Drs. D'Alessandro and Kuglar, for example, specifically discussed Heidler's "depression." And several witnesses, including Dr. D'Alesandro, Dr. Ifill, Dr. Kuglar, Dr. Maish, Heidler's mother, Ms. Oglesby, and Ms. Boatright explained that Heidler had a history of self-mutilation and suicide attempts, including that Heidler burned himself with cigarettes, cut himself, stepped in front of a truck, and hung himself. So trial counsel *did* present evidence of depression.

Trial counsel also presented evidence that Heidler suffered from psychosis. For example, Dr. D'Alesandro told the jury that "[t]here was a suggestion" in the records that Heidler had experienced "psychotic episodes." Dr. Ifill spoke about "evaluations where [Heidler's] behavior at one point might have been thought of being psychotic." Dr. Kuglar discussed Heidler talking about "auditory delusion[s]" like "hearing . . . voices" and the sound of "a baby crying." Ms. Boatright said that Heidler "always talked about a knife cutting him, could a knife come through a ceiling and cut him." She also testified that Heidler "always had an imaginary mouse" that he would talk to. Ms. Dryden similarly said that

Heidler "would sometimes refer to some type of imaginary friend" and "act like it was in his hand and he would talk to it sometimes." So trial counsel did present evidence of Heidler's depression and psychosis. We can't say that the state habeas court unreasonably rejected any argument to the contrary.

Second, Heidler argues that he "suffered severe abuse and neglect as a child, living with adults who physically hurt him and who failed to secure even his most basic needs," but that trial counsel "made almost no mention of the trauma." But, as we've seen, trial counsel brought out testimony about Heidler's abuse and neglect through several witnesses. As to abuse, Dr. Ifill testified that "there was violence or threats of violence or neglect within the household." Ms. Oglesby discussed reports "alleging physical abuse." As to neglect, several witnesses testified that Heidler was "[d]eprived of . . . familial love and support." And several witnesses, including Dr. Ifill, Ms. Oglesby, and Ms. Wright, discussed a history of "neglect." In essence, Heidler appears to argue that trial counsel failed to present more or better evidence of Heidler's abuse or neglect. But the state habeas court did not unreasonably conclude that that's not enough. A petitioner cannot show a deficient presentation simply by pointing to "more or better examples" that support "the themes presented to the jury." *Holsey*, 694 F.3d at 1260–61 (op. of Ed Carnes, J.).

Third, Heidler repeatedly asserts that witnesses were "not prepared" to testify. He says, for example, that trial counsel failed to prepare Dr. Maish to testify. But the state habeas court found

that trial counsel met with Dr. Maish on at least a dozen occasions, that they told Dr. Maish about Heidler's self-mutilation pending trial, and that they reported to Dr. Maish the information they learned from witnesses. Heidler has failed to undermine these findings by clear and convincing evidence. *See Kimbrough v. Sec'y, DOC*, 565 F.3d 796, 804 (11th Cir. 2009). Heidler also points to Ms. Oglesby, arguing that "her trial testimony reflects a similar lack of reasonable preparation." But the record doesn't reflect a lack of preparation. Ms. Oglesby recalled that she "became involved with [Heidler] in a child protective service manner in May 1990"; that there was a report "alleging physical abuse, emotional abuse, [and] neglect," and that DFACS "confirmed neglect"; that she had "[m]onthly" conversations with Heidler's family; that she "visited [Heidler's] home" and that "[t]hey lived in two different residence[s] during" that time period; and that Heidler's family told her they "had a long history with DF[A]CS" and "had a lot of negative feelings about DF[A]CS." These are simply by way of example, and they render implausible the claim that Ms. Oglesby came in unprepared to testify. We can't say the state habeas court unreasonably concluded that trial counsel did an adequate job preparing witnesses.

Fourth, Heidler argues that trial counsel's presentation of his DFACS records was unreasonable because they "dump[ed them] into the record[] without any explanation . . . at the conclusion of the penalty phase." But trial counsel testified that this was a strategic decision. As Ms. Palmer explained, she spent "hours" with DFACS employees going through Heidler's records and

"ferret[ing] out boxes of records" that weren't helpful to the case. She explained that they were still left with "a stack this high" of records "that had relevant information" and that she "redact[ed]" all of those records. Rather than go through all of these records one by one at trial, trial counsel decided to call certain DFACS case-workers "who were the most articulate, who had had the most contact with him, and, of course, my perspective, who were the most sympathetic towards his plight." Ms. Palmer explained that she relied on *these* witnesses to present relevant information from those records to the jury in a digestible form that wouldn't bore the jurors to sleep:

> Q  Now, when you had the caseworkers on the stand were you trying to bring out some specific highlights within—?—
>
> A  We did.  That's exactly what we did.
>
> Q  Okay.
>
> A  I mean, you couldn't possibly, we would have spent days and days with the jury had we tried to go through that entire stack of records.  And we tried to hit the really tough parts, where [Heidler] was truly harmed . . . by people in his life who were harming him and not helping him with his mental health issues.  Other things they did that did nothing but exacerbate the mental illness that he had suffered all his life.  And I don't think there's a person in the world that says [Heidler] has not had mental illness since he was very young.

Q  And all of that was presented to the jury?

A  Yes.

Q  They had all of that information; is that right?

A  That's correct.  That's correct.

In line with this testimony, the state habeas court found that trial counsel made a strategic decision to "present[ Heidler's] DFACS records en mass, without a lengthy and cumulative review with the jury."  "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact," *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998), and Heidler has not undermined the state habeas court's finding by clear and convincing evidence.  Because trial counsel's decision as to how to present the information in the records was a strategic decision, that decision is "virtually unassailable."  *Williams*, 185 F.3d at 1242.

And fifth, Heidler argues that the state habeas court "discount[ed] to irrelevance" the state habeas affidavits.  The Supreme Court, it's true, has held, with respect to evidence adduced from deposition testimony during habeas proceedings, that it was "unreasonable to discount to irrelevance the evidence of [the petitioner's] abusive childhood, especially when that kind of history may have particular salience for a jury evaluating [the petitioner's] behavior."  *Porter*, 558 U.S. at 43.  But a state court's decision is not contrary to nor an unreasonable application of law where it simply "review[s] the [p]etitioner's affidavit evidence with caution" but

does not "discount[] the contents of the affidavits to irrelevance." *Pye*, 50 F.4th at 1045 (cleaned up).

And, here, there's no indication that the state habeas court discounted the affidavits "to irrelevance." The state habeas court considered the affidavits, but it credited Ms. Palmer's testimony that Heidler's family and friends weren't helpful during her pretrial investigation and reasoned that trial counsel "cannot be responsible for [Heidler's] family's reticence in revealing shameful family secrets." "[T]he state [habeas] court's decision to view the affidavit evidence with caution was neither contrary to nor an unreasonable application of clearly established federal law." *Id.* (marks omitted).

Also, there were inconsistencies between the trial testimony and the habeas affidavits. For example, Ms. Aguilar went from testifying at the penalty phase that her and Heidler's stepfather "only talked" to writing in her state habeas affidavit that their stepfather "threatened to kill [Heidler]" and "threatened to slit [Heidler's] throat." "[I]t wasn't unreasonable for the state court to discount the affidavits, to some degree, based on the inconsistencies it found in several of them[.]" *Id.* at 1046.

In any event, Dr. Kuglar said in his state habeas affidavit that Heidler's state habeas evidence would not have changed his diagnosis; the evidence would have merely allowed Dr. Kuglar to "testif[y] with more certainty that [Heidler] ha[d] a serious mental illness." Thus, it wasn't unreasonable for the state habeas court to give little weight to the affidavits in its analysis of trial counsel's

presentation of mitigation evidence. *See Van Poyck*, 290 F.3d at 1324 n.7.

In short, trial counsel investigated Heidler's background and mental health, interviewed his family members, friends, social workers, teachers, and mental health experts, had a strategy for the penalty phase, and called mitigation witnesses. The Georgia Supreme Court did not unreasonably apply clearly established federal law in determining that trial counsel's performance was not ineffective.

<u>Prejudice</u>

The state habeas court concluded that, even if trial counsel's investigation and presentation of mitigation evidence was deficient, there wasn't a reasonable probability that the result of the penalty phase would have been different "given the copious amount of mitigating evidence presented at trial and the nature of [Heidler's] crimes." That conclusion was far from unreasonable. The mitigating evidence not presented as a result of counsel's deficient performance must be weighed "against the evidence in aggravation." *Porter*, 558 U.S. at 41. We've repeatedly held that even extensive mitigating evidence wouldn't have been reasonably likely to change the outcome of sentencing given a particularly heinous crime and significant aggravating factors. *See, e.g.*, *Windom*, 578 F.3d at 1251 (noting that, given "the strength of the state's case" "and the nature of the crimes themselves," the state court didn't "unreasonably apply *Strickland* when it found that the available mitigating evidence, taken as a whole, did not outweigh the

aggravating nature of Windom's crimes" (citing *Payne v. Allen*, 539 F.3d 1297, 1318 (11th Cir. 2008))); *Suggs v. McNeil*, 609 F.3d 1218, 1232 (11th Cir. 2010) (explaining that significant aggravating facts are "difficult to overcome" and holding that a state supreme court's prejudice decision wasn't unreasonable).

The jury learned about how Heidler shot the Danielses as they slept, shot their 8-year-old son and sixteen-year-old daughter from close range, shot Mr. Daniels a several more times as Mr. Daniels tried to protect himself, kidnapped the Danielses' three young daughters, raped one of them, and dropped them off on a remote dirt road before he returned home to play video games. The jury also heard that rather than showing remorse, Heidler told people that he "wasn't through collecting souls" and referred to the Daniels family as "nine little piggies, four dead." And the jury learned that Heidler hid weapons in his prison uniform, escaped from prison, and threatened to kill prison officials. It wasn't unreasonable for the state habeas court to weigh these aggravating factors heavily in its evaluation of whether the presentation of additional mitigation evidence about Heidler's background would have changed the outcome of the penalty phase.

The state habeas court also found that "none of [Heidler's state habeas] experts or prior mental health experts ha[d] testified that [Heidler] was in fact in the throes of a psychotic episode when he committed the crime," and it concluded that "without this causal link between the alleged mental illness and the crimes, there exist[ed] no evidence that the outcome of [Heidler's trial] would

have been different." Heidler argues that this conclusion is unreasonable because it "required a causal link" between the evidence of Heidler's mental health and the crime. Heidler is correct that there is no requirement that mitigation evidence have a "causal connection" to the defendant's crimes. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("[W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime."). But Dr. D'Alesandro testified that "what [Heidler] was doing was volitional and it was fairly goal oriented" and that Heidler's "symptoms seem[ed] to be somewhat in remission" because the symptoms "from early childhood d[idn]'t appear to be happening right now." It therefore wasn't unreasonable for the state habeas court to find and weigh in its prejudice analysis the fact that evidence of Heidler's mental health was less likely to influence jurors because it wasn't strongly connected to his crimes. *See Shinn*, 141 S. Ct. at 525 (concluding that "reasonable jurists could debate the extent to which [petitioner's bipolar disorder and untreated addictions] significantly impaired his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the law at the time of the murder" because the defendant's actions before, during, and after the murder "display[ed] a measure of control and intentionality").

Finally, Heidler argues that the Georgia Supreme Court unreasonably applied *Strickland* because it failed to assess prejudice cumulatively. Heidler is wrong. The state habeas court "consider[ed trial] counsel's representation as a whole" and concluded that even if trial counsel's "alleged errors constituted deficient

performance," there was not "a reasonable probability[] that but for this performance[] the result of either phase of [Heidler's] trial . . . would have been different. And even if the state habeas court had only assessed prejudice on an "item-by-item" basis, that would "not [be] inconsistent with a cumulative analysis," and the state habeas court is "presume[ed]" to have "assessed prejudice cumulatively." *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 749–50 (11th Cir. 2010). Heidler fails to rebut that presumption.

C.    *Heidler's Claim That Trial Counsel Were Ineffective for Failing to Adequately Present Information and Evidence in Pretrial Motions Relating to Heidler's Waiver of Constitutional Rights During Interrogation by the Police*

The district court denied Heidler's claim that trial counsel were ineffective for failing to adequately litigate Heidler's waiver of constitutional rights during his interrogation by the police because, the district court concluded, the claim was unexhausted and insufficiently pled. We "may skip over the procedural default analysis if a claim would fail on the merits in any event." *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020). We'll take this "'Ockham's razor' approach" and "skip over the difficult procedural default questions and cut to the heart of the matter" because, even under de novo review, Heidler's claim fails because he cannot establish prejudice. *See id.* at 1307 & n.4.

Heidler argues that he was prejudiced by the state's presentation of his videotaped confession and the two police officers' testimony about Heidler's statements during the interrogation

because of "the unique importance of a defendant's confession" and "the prosecutor's reliance on it" during both the guilt phase and penalty phase of trial. Indeed, we've found that an attorney's "failure to move to suppress the [defendant's] confessions was *extremely* prejudicial" where the confessions "provided the primary evidence offered" and where, "[w]ithout the confessions, conviction for first degree murder was probably impossible." *See Smith v. Wainwright*, 777 F.2d 609, 616–17 (11th Cir. 1985). But we've also found that a defendant "was not prejudiced by the failure of counsel to suppress the police confessions" where "the state had abundant evidence (including other confessions) at its disposal with which to obtain a conviction." *Zamora v. Dugger*, 834 F.2d 956, 959 (11th Cir. 1987).

As the Georgia Supreme Court found in affirming Heidler's convictions, there was overwhelming evidence of Heidler's guilt, including: the Danielses' three daughters each identifying Heidler as their kidnapper, Heidler's fingerprint on the back window of the Danielses' home, and his DNA on a cigarette butt found on the floor in the Danielses' home. *See Heidler*, 537 S.E.2d at 52. And Heidler's statements to police during his interrogation weren't the only confessions at the state's disposal. Heidler confessed to the murders to both Dr. Kuglar and Dr. Maish during his mental health evaluations, and Drs. Kuglar and Maish told the jury what Heidler had told them about the murders. Because the state had abundant evidence with which to obtain a conviction—including Heidler's confessions to Dr. Kuglar and Dr. Maish—Heidler can't establish

that the jury wouldn't have sentenced him to death even if the jury hadn't heard his statements to police.  *See Zamora*, 834 F.2d at 959.

## CONCLUSION

The Georgia Supreme Court didn't unreasonably apply *Strickland* in denying Heidler's claims that trial counsel were ineffective in investigating and presenting his mental health during the guilt phase and in investigating and presenting mitigating evidence during the penalty phase.  And even assuming that Heidler's claim that trial counsel were ineffective in litigating the suppression of his statement to police isn't procedurally defaulted, the claim fails under de novo review because Heidler wasn't prejudiced.  We therefore **AFFIRM** the district court's denial of Heidler's section 2254 petition.